**EXHIBIT 6**

 CT Corporation

**Service of Process Transmittal**
07/28/2009
CT Log Number 515198483

| | |
|---|---|
| **TO:** | David Metzman, Senior Vice President - CLO<br>Gramercy Advisors<br>20 Dayton Avenue<br>Greenwich, CT 06830- |
| **RE:** | **Process Served in Delaware** |
| **FOR:** | Gramercy Asset Management LLC (Domestic State: DE) |

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Shahid R. Khan, et al., Pltfs. vs. BDO Seidman, L.L.P., et al. including Gramercy Asset Management LLC, Dfts.<br>*Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Champaign County Circuit Court 6th Judicial Circuit, IL<br>Case # 09-L-139 |
| **NATURE OF ACTION:** | Breach of Fiduciary Duty - The defendants failed to advise plaintiffs that the legal opinions were not independent and advising them that they could make a profit on the Distressed Debt Strategy when they knew that it would be disallowed and held by the IRS to be improper and illegal |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/28/2009 at 10:00 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service of summons, not counting day of service |
| **ATTORNEY(S) / SENDER(S):** | J. Dylan Snapp<br>Loewinsohn Flegle Deary, LLP<br>12377 Merit Drive<br>Suite 900<br>Dallas, TX 75251<br>214-572-1700 |
| **REMARKS:** | Please note: You are required to serve an answer upon two parties. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 799424556433<br>Image SOP<br>Email Notification, David Metzman dmetzman@gramercyadvisors.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | The Corporation Trust Company<br>Scott LaScala<br>1209 Orange Street<br>Wilmington, DE 19801<br>302-658-7581 |

Page 1 of  1 / JH

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
CHAMPAIGN COUNTY, ILLINOIS

| | | |
|---|---|---|
| SHAHID R. KHAN; ANN C. KHAN; UVIADO LLC; JONCTION LLC; AND LEMAN LLC | § § § § | |
| *Plaintiffs*, | § § § | CASE NO 09-L-139 |
| vs. | § § § | |
| BDO SEIDMAN, L.L.P.; PAUL SHANBROM; MICHAEL COLLINS; GRAMERCY ADVISORS, LLC; GRAMERCY ASSET MANAGEMENT LLC; GRAMERCY FINANCIAL SERVICES, LLC; TALL SHIPS CAPITAL MANAGEMENT, LLC; JAY A. JOHNSTON; MARC HELIE; DECASTRO, WEST, CHODOROW, GLICKFELD & NASS, INC.; AND FINANCIAL STRATEGY GROUP, PLC | § § § § § § § § § § § § § | |
| *Defendants*. | § § | |

### SUMMONS

**TO THE DEFENDANT**: Gramercy Asset Management, LLC – The Corporation Trust Co., Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801

   **YOU ARE SUMMONED** and required to file a written answer or other pleading in the office of the Clerk of this Court on the second floor of the Court House, Urbana, Illinois, within thirty (30) days after service of this Summons, not counting the day of service. **IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT**.

To the Officer:
   This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so indorsed.
   This Summons may not be served later than thirty (30) days after its date.

Witness: _____July 8_____, 2009.

(Seal of Court)

Linda S. Franks
_____
(Clerk of Court)

J. Dylan Snapp
Loewinsohn Flegle Deary, LLP, Attys. for Plaintiff
12377 Merit Dr., Ste. 900
Dallas, TX 75251
Telephone: 214-572-1700
Date of Service: _____, 2009
(To be inserted by server on copy left with Defendant or other person.)

2009 JUL 24   PM 2: 52

NEW CASTLE COUNTY
IN SHERIFF'S HANDS

IN THE CIRCUIT COURT OF CHAMPAIGN COUNTY, ILLINOIS

SHAHID R. KHAN; ANN C. KHAN; §
UVIADO LLC; JONCTION LLC; AND §
LEMAN LLC §
§          CASE NO 09- *2 / 89*
*Plaintiffs*, §
§
vs. §          **JURY DEMAND**
§
BDO SEIDMAN, L.L.P.; PAUL §
SHANBROM; MICHAEL COLLINS; §
GRAMERCY ADVISORS, LLC; §
GRAMERCY ASSET MANAGEMENT §
LLC; GRAMERCY FINANCIAL §
SERVICES, LLC; TALL SHIPS §
CAPITAL MANAGEMENT, LLC; JAY §
A. JOHNSTON; MARC HELIE; §
DECASTRO, WEST, CHODOROW, §
GLICKFELD & NASS, INC.; AND §
FINANCIAL STRATEGY GROUP, PLC §
§
*Defendants.* §



**FILED**
SIXTH JUDICIAL CIRCUIT

**5**  JUL 0 6 2009

Linda S. F_____
CLERK OF THE CIRCUIT COURT
CHAMPAIGN COUNTY, ILLINOIS

## COMPLAINT AT LAW

    Plaintiffs Shahid R. Khan, Ann C. Khan, UVIADO LLC, JONCTION LLC, and

LEMAN LLC ("Plaintiffs") assert claims against Defendants BDO Seidman, LLP, Paul

Shanbrom and Michael Collins (collectively "BDO" or "BDO Seidman"), Gramercy

Advisors, LLC, Gramercy Asset Management LLC, Gramercy Financial Services, LLC,

Tall Ships Capital Management, LLC, Jay A. Johnston, and Marc Helie (collectively

"Gramercy"), DeCastro, West, Chodorow, Glickfeld & Nass, Inc. ("DeCastro"), and

Financial Strategy Group, PLC ("Financial Strategy") (BDO, Gramercy, DeCastro, and

Financial Strategy are collectively referred to herein as the "Defendants") and state as

follows:

I.

## JURISDICTION AND VENUE

1.       This Court has jurisdiction under 735 ILCS 5/2-209 because the Defendants are present and transact business in this State and committed tortious acts within this State, all as more fully described below.

2.       Venue is proper under 735 ILCS 5/2-101 because Champaign County is where a substantial part of the transactions occurred out of which Plaintiffs' causes of action arose.

3.       This Court has personal jurisdiction over each of the Defendants. Each of the Defendants has its principal place of business in the State of Illinois, and/or has committed a tort in whole or in part in Illinois, and/or has otherwise done business in Illinois, all as more fully described below.

II.

## PARTIES

4.       Plaintiff Shahid R. Khan is an individual and a citizen of Illinois. Mr. Khan resides in Champaign, Illinois.

5.       Plaintiff Ann C. Khan is an individual and a citizen of Illinois. Mrs. Khan resides in Champaign, Illinois.

6.       Plaintiff UVIADO LLC is a Delaware limited liability company with its principal place of business in Houston, Texas.

7.       Plaintiff JONCTION LLC is a Delaware limited liability company with its principal place of business in Houston, Texas.

8.     Plaintiff LEMAN LLC is a Delaware limited liability company with its principal place of business in Houston, Texas.

9.     Defendant BDO Seidman, LLP is a limited liability partnership organized and existing under the laws of New York with its principal place of business at 233 Michigan Ave., Suite 2500, Chicago, IL 60602. This Defendant has been admitted to and registered to do business in Illinois.

10.     Defendant Paul Shanbrom is an individual and, on information and belief, a citizen of Michigan. Upon information and belief, Shanbrom resides at 7181 Deer Lake Ct., Clarkston, MI 48346. Mr. Shanbrom is or was during the relevant period an employee of BDO Seidman, LLP. This Court has personal jurisdiction over Mr. Shanbrom pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Mr. Shanbrom has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Mr. Shanbrom has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Mr. Shanbrom has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Mr. Shanbrom has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Mr. Shanbrom will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

11. Defendant Michael Collins is an individual and, on information and belief, a citizen of Michigan. Upon information and belief, Collins' principal place of business is at 755 W Big Beaver Rd., #1900, Troy, Michigan 48084-4906. Mr. Collins is or was during the relevant period an employee of BDO Seidman, LLP. This Court has personal jurisdiction over Mr. Collins pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Mr. Collins has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Mr. Collins has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Mr. Collins has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Mr. Collins has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Mr. Collins will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

12. Defendant Gramercy Advisors, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut 06830. This Court has personal jurisdiction over Gramercy Advisors, LLC pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Gramercy Advisors, LLC has done and is doing business in the State of Illinois, but does not maintain a regular

**PLAINTIFFS' COMPLAINT AT LAW** **Page 4**

place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Gramercy Advisors, LLC has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Gramercy Advisors, LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Gramercy Advisors, LLC does business in the State of Illinois through its website on the Internet: www.gramercy.com. Gramercy Advisors, LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Gramercy Advisors, LLC acting within the scope of their employment or agency. Gramercy Advisors, LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Gramercy Advisors, LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

13. Defendant Gramercy Asset Management LLC is a limited liability company organized an existing under the laws of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut. This Court has personal jurisdiction over Gramercy Asset Management LLC pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Gramercy Asset Management LLC has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Gramercy Asset Management LLC has contracted with an Illinois resident, and either party was to perform the contract in

**PLAINTIFFS' COMPLAINT AT LAW**                                                    **Page 5**

whole or in part in the State of Illinois. Additionally, Gramercy Asset Management LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Gramercy Asset Management LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Gramercy Asset Management LLC acting within the scope of their employment or agency. Gramercy Asset Management LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Gramercy Asset Management LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

14.     Defendant Gramercy Financial Services, LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware with its principal place of business is at 20 Dayton Avenue, Greenwich, Connecticut 06830. This Court has personal jurisdiction over Gramercy Financial Services, LLC pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Gramercy Financial Services, LLC has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Gramercy Financial Services, LLC has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Gramercy Financial Services, LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the

brunt of the harm was felt. Gramercy Financial Services, LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Gramercy Financial Services, LLC acting within the scope of their employment or agency. Gramercy Financial Services, LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Gramercy Financial Services, LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

15. Defendant Tall Ships Capital Management LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business at 20 Dayton Avenue, Greenwich, Connecticut 06830. This Court has personal jurisdiction over Tall Ships Capital Management LLC pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Tall Ships Capital Management LLC has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Tall Ships Capital Management LLC has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Tall Ships Capital Management LLC has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Tall Ships Capital Management LLC's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of Tall Ships Capital Management LLC acting within the scope of their employment or agency. Tall Ships

**PLAINTIFFS' COMPLAINT AT LAW** Page 7

Capital Management LLC has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Tall Ships Capital Management LLC will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

16.     Defendant Jay A. Johnston is an individual and, on information and belief, a citizen of Connecticut. Upon information and belief, Johnston's principal place of business is at 124 Ritch Ave., W., Greenwich, CT 06830. This Court has personal jurisdiction over Mr. Johnston pursuant to the constitution and laws of the United States and the State of Illinois.     At all relevant times, Mr. Johnston has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Mr. Johnston has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Mr. Johnston has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Mr. Johnston has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Mr. Johnston will not offend traditional notions of fair play and substantial justice and is consistent with due process of law. Mr. Johnston is or was during the relevant period an employee of Gramercy Advisors, LLC.

**PLAINTIFFS' COMPLAINT AT LAW**                                                      **Page 8**

17.     Defendant Marc Helie is an individual and, on information and belief, a citizen of New York.  Upon information and belief, Helie resides at 210 Lafayette St., Apt. 9B, New York, NY 10012-4042.  This Court has personal jurisdiction over Mr. Helie pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Mr. Helie has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, Mr. Helie has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois.  Additionally, Mr. Helie has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt.  Mr. Helie has purposefully availed himself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Mr. Helie will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  Mr. Helie is or was during the relevant period an employee of Gramercy Advisors, LLC.

18.     Defendant DeCastro, West, Chodorow, Glickfeld & Nass, Inc. is a corporation organized and existing under the laws of the State of California with its principal place of business at 10960 Wilshire Boulevard, Suite 1400, Los Angeles, California 90024.  This Court has personal jurisdiction over DeCastro pursuant to the constitution and laws of the United States and the State of Illinois.  At all relevant times, DeCastro has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in

this civil action. As described hereafter, DeCastro has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, DeCastro has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. DeCastro's conduct in the State of Illinois has been committed by officers, directors, employees, and/or agents of DeCastro acting within the scope of their employment or agency. DeCastro has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against DeCastro will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

19.     Defendant Financial Strategy Group PLC is a foreign corporation organized and existing under the laws of the State of Tennessee with its principal place of business at 700 Colonial Rd., Suite 120, Memphis, TN 38117. This Court has personal jurisdiction over Financial Strategy pursuant to the constitution and laws of the United States and the State of Illinois. At all relevant times, Financial Strategy has done and is doing business in the State of Illinois, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action. As described hereafter, Financial Strategy has contracted with an Illinois resident, and either party was to perform the contract in whole or in part in the State of Illinois. Additionally, Financial Strategy has committed torts, in whole or in part, in the State of Illinois, including intentional tortious acts directed at a resident of the State of Illinois, where the brunt of the harm was felt. Financial Strategy's conduct in the State of Illinois has been

committed by officers, directors, employees, and/or agents of Financial Strategy acting within the scope of their employment or agency.  Financial Strategy has purposefully availed itself of the benefits and protections of the laws of the State of Illinois and could reasonably anticipate being subject to the jurisdiction of courts of the State of Illinois. This suit against Financial Strategy will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.

### III.

### NATURE OF THE CLAIMS

### A. THE DISTRESSED DEBT STRATEGIES[1]

20.    Plaintiffs bring this action against Defendants seeking damages for breach of fiduciary duty, negligence, negligent misrepresentation, disgorgement, rescission, fraud, violations of the Illinois Consumer Fraud Act, breach of contract, civil conspiracy and declaratory judgment.    Plaintiffs seek compensatory damages against their professional advisors for damages arising from a series of tax-advantaged investment strategies using investments in distressed debt that Plaintiffs executed in 2002 and 2003 and utilized on their federal and state tax returns for the 2002 and 2003 tax years ("Distressed Debt Strategies").  The Defendants and the Other Participants jointly and in concert developed, promoted, sold, and implemented the Distressed Debt Strategies.

---

[1] Plaintiffs engaged in a Distressed Debt Strategy in 2002.  BDO, Gramercy, DeCastro and Financial Strategy were the Defendants involved in the 2002 Distressed Debt Strategy and the Other Participants included Refco Capital Markets, Ltd and Mathew Hoff ("Refco").  Plaintiffs engaged in a Distressed Debt Strategy in 2003.  BDO, Gramercy, DeCastro and Financial Strategy were the Defendants involved in the 2003 Distressed Debt Strategy.

Plaintiffs further pray for a declaratory judgment seeking, among other things, a declaration that certain purported fee agreements are void and unenforceable.

21.     The Distressed Debt Strategies are set forth in detail below.     The Defendants and the Other Participants, acting pursuant to an elaborate and carefully devised common scheme, counseled and advised Plaintiffs to undertake the Distressed Debt Strategies, claiming the Distressed Debt Strategies would yield a substantial profit and, at the same time, legally minimize Plaintiffs' state and federal tax liability.  At the time Defendants marketed and sold the Distressed Debt Strategies to Plaintiffs, Defendants knew or should have known that the Distressed Debt Strategies would not yield the investment results or tax treatment claimed.  Importantly, Defendants' primary motive in their pre-planned scheme was to exact significant fees and commissions from Plaintiffs.

22.     Defendants knew, at the time they promoted and sold the Distressed Debt Strategies to Plaintiffs, that federal authorities were involved in ongoing investigations of transactions that were the same or substantially similar to the Distressed Debt Strategies and had concluded that these transactions were illegal and abusive tax shelters.  Despite this knowledge, Defendants did not so inform Plaintiffs.  The IRS ultimately disallowed Plaintiffs' Distressed Debt Strategies and determined that Plaintiffs owed substantial back taxes, interest, and penalties.

23.     Plaintiffs are and were unknowledgeable and unsophisticated about tax matters, including tax law and tax-advantaged investment strategies.     Plaintiffs detrimentally relied on their trusted legal, accounting, tax, financial, and investment advisors at BDO Seidman, Gramercy, DeCastro, and Financial Strategy for

comprehensive legal, accounting, financial, investment, and tax advice and planning, and upon Defendants' repeated unequivocal representations that the Distressed Debt Strategies were completely legal and valid.

24.    Unbeknownst to Plaintiffs, Defendants entered into undisclosed (and possibly illegal) business arrangements with each other and the Other Participants. Through these arrangements, BDO Seidman systematically identified potential or existing clients who had substantial capital gains or ordinary income in a particular tax year.  Then, playing on its position of trust, confidence, and prestige with its clients, BDO Seidman – in accordance with the Defendants' pre-planned scheme - steered clients such as Plaintiffs to BDO's Tax Solutions Group (an internal group within BDO responsible for designing, marketing, selling and implementing tax strategies), Gramercy, DeCastro, Financial Strategy and the Other Participants for legal, accounting, investment, and tax advice and services in connection with the Distressed Debt Strategies.

25.    Why were firms like BDO Seidman, Gramercy, DeCastro, and Financial Strategy eager to participate and "rope in" their clients in this way?  As BDO Seidman itself put it: **"One word sums up the strategy of the Tax Business Line.  MONEY!"**[2] Defendants and the Other Participants entered into an arrangement where each would receive a certain portion of the fee for each Distressed Debt Strategy sold.  The fee was not based on an hourly rate or time spent working on the deal; rather, the fee was based

---

[2] Quote from p. 3 of the BDO Seidman 2000 "Imagine the Possibilities" Business Line Strategy publication, pushing its "Tax Solutions" (*i.e.*, tax shelters) services, suggesting they all work together to **"change BDO into a green ocean"** (*id.* at 1) and that they should all **"Think Green.  Green is good!"**  *Id.* at 3. Apparently, BDO's group in charge of these efforts was known as the "Wolfpack."    Accordingly, this publication, Government Exhibit 26 in an Appendix filed in *United States v. BDO Seidman*, No. 02-C-4822 N. D. Ill., will be herein referred to as the "Wolfpack Manual."

solely on "the size" of the Distressed Debt Strategy.  In other words, the bigger the deal, the larger the fee shared by Defendants and the Other Participants.  And where was the money?  Again, according to BDO Seidman: **"Where is the real money? SHOW ME THE MONEY – It's right in front of our faces. Our clients have the money."**[3]  Thus, BDO Seidman had a motive to sell as many Distressed Debt Strategies as possible, as large as possible.  Not surprisingly, the Tax Solutions Group at BDO Seidman grew from $2.2 million in profits by 1998 to $14.8 million in profits in 1999,[4] and to in excess of $77 million of revenues in 2000.[5]

26.     BDO Seidman advised its clients, including Plaintiffs, that its tax professionals – and in particular BDO's tax professionals who had special expertise with transactions like the Distressed Debt Strategies - had designed proprietary tax-advantaged investment strategies that would provide an above average rate of return and at the same time minimize tax obligations resulting from substantial capital gains and/or ordinary income.  Defendants knew or should have known that the Distressed Debt Strategies were, in reality, likely to be held by the IRS as nothing more than illegal and abusive tax shelters.  To profit from their scheme, Defendants counted on their ability to conceal the true nature of the Distressed Debt Strategies from tax authorities and Plaintiffs.[6]

---

[3] Wolfpack Manual at 6.

[4] Wolfpack Manual at 7.

[5] Government Exhibit 27 in an Appendix filed in *United States v. BDO Seidman*, No. 02-C-4822 (N. D. Ill).

[6] Michael Kerekes, a former principal at BDO, recently plead guilty to conspiracy to defraud the United States and tax evasion on February 13, 2009.  According to his plea agreement, the charges were based on Kerekes' "involvement, between in or about 1998 and 2003, in a conspiracy to defraud the United States, commit tax evasion, aid and assist in the preparation of false and fraudulent income tax returns, and obstruct and impede

27.     The Defendants and the Other Participants jointly conspired to design the Distressed Debt Strategies before the Defendants, with the assistance of the Other Participants, executed their plan to promote and sell the Distressed Debt Strategies to their own clients – such as Plaintiffs.  As part of this scheme, DeCastro agreed that BDO Seidman could promise prospective clients, such as Plaintiffs, that they would receive legal opinions certifying the soundness and legality of the Distressed Debt Strategies that Defendants convinced the clients to execute.  For a substantial fee, DeCastro issued legal opinions to Plaintiffs that purported to substantiate the bona fides of the Distressed Debt Strategies and provide absolute penalty protection.

28.     According to the Criminal Information filed by the United States against Michael Kerekes (a former principal at BDO Seidman and member of the Tax Solutions

---

due administration of the internal revenue laws, all in connection with the design, marketing, and implementation of tax shelter transactions while acting as a principal of BDO Seidman LLP."

Adrian Dicker, another former partner at BDO, also recently pled guilty to conspiracy to defraud the United States and tax evasion on March 17, 2009.  According to the United States Department of Justice, Dicker's guilty plea resulted from his involvement in the design, marketing, sale and implementation of tax shelter transactions for BDO's clients.

Charles Bee, another former partner at BDO, also recently plead guilty to conspiracy to defraud the United States and tax evasion on June 3, 2009.  According to the United States Department of Justice, Bee's guilty plea resulted from his involvement in the design, marketing, sale and implementation of tax shelter transactions for BDO's clients.

The United States recently filed criminal indictments against Robert Greisman and Dennis Field, former partners at BDO, on June 9, 2009, in connection with their involvement in the design, marketing, sale, and implementation of fraudulent tax shelters. Field was the head of National Tax at BDO and a former Chairman and CEO of BDO.

Kerekes, Dicker, Bee, Greisman, and Field were members of BDO's Tax Solutions Group – the group within BDO Seidman responsible for the design, promotion, sale and implementation of BDO tax-reducing strategies, including Distressed Debt Strategies.

Group), BDO Seidman, in furtherance of the conspiracy, developed a template consulting agreement for use in the tax shelter transactions. See *U.S. v. Kerekes*, Information at p. 11, 16. This consulting agreement was deliberately broad and vague and did not specifically refer to the tax shelter transactions (e.g., the Distressed Debt Strategies). *Id.* The purpose of the consulting agreement was to conceal from the IRS the fact that the transaction was in fact a tax shelter and to conceal from the IRS the actual fees paid to BDO in connection with the tax shelter transactions so that only a portion of the fees would be considered if and when the IRS conducted a profitability analysis of the tax shelter transaction. *Id.* Of course, Plaintiffs were unaware of these facts and BDO's motive. Plaintiffs were fraudulently induced to enter into these consulting agreements with BDO in connection with the Distressed Debt Strategies.[7]

29. Despite Defendants' knowledge that the IRS would likely disallow the Distressed Debt Strategies, BDO Seidman and Financial Strategy[8] assisted Plaintiffs with the preparation of their federal and state tax returns utilizing the losses generated by the Distressed Debt Strategies. BDO and/or Financial Strategy then signed the tax returns and advised Plaintiffs to sign and file the tax returns. Even after Defendants learned that the IRS had begun to audit and disallow the losses generated by tax-advantaged investment strategies that were the same or substantially similar to Plaintiffs' Distressed Debt Strategies, Defendants continued to advise Plaintiffs to execute the Distressed Debt

---

[7] Likewise, Gramercy fraudulently induced Plaintiffs into entering into an "investment" agreement. Plaintiffs were unaware that Gramercy and BDO were "in cahoots", were in no way independent of one another, and were sharing/splitting fees that Plaintiffs paid to BDO.

[8] BDO and Financial Strategy prepared certain of the Plaintiffs' tax returns for the 2002 and 2003 tax years.

Strategies and use the losses generated from the Distressed Debt Strategies to offset income and/or capital gains on their tax returns.

30.    After BDO Seidman convinced their clients, including the Plaintiffs, to execute the Distressed Debt Strategies, Gramercy stepped in, and with the assistance of BDO, worked with Plaintiffs to execute the "investment" component of the Distressed Debt Strategies.  The efforts of DeCastro culminated in their prefabricated and canned legal opinions confirming the propriety of the respective Distressed Debt Strategies.  At no point in time did Defendants or any of the Other Participants ever disclose to Plaintiffs that they had conspired to design, promote, sell, and implement the Distressed Debt Strategies.

31.    At all times alleged herein, Defendants knew that Plaintiffs placed tremendous trust and faith in Defendants as Plaintiffs' legal, accounting, tax, financial, and investment advisors with respect to all aspects of the Distressed Debt Strategies. Further, because of BDO Seidman's unique relationship with Plaintiffs – and the trust and confidence this relationship created - BDO Seidman knew that if BDO Seidman recommended the Distressed Debt Strategies to Plaintiffs, Plaintiffs were likely to follow their recommendation and participate in the Distressed Debt Strategies.

32.    Based on Defendants' advice and recommendations, Plaintiffs paid a significant amount of fees to Defendants and the Other Participants to implement the Distressed Debt Strategies.[9]  Ultimately, as a direct result of Defendants' improper advice

---

[9] Unbeknownst to Plaintiffs, BDO Seidman "kickbacked" to Gramercy part of the fee Plaintiffs' paid to BDO Seidman.  Neither BDO nor Gramercy disclosed to Plaintiffs that BDO had an agreement with Gramercy that required BDO to kick-back to Gramercy part of the fee that Plaintiffs paid to BDO.  Moreover, the purported agreements Plaintiffs were required to execute with BDO and Gramercy failed to disclose this fee kick-back.

and conduct, the IRS disallowed Plaintiffs' Distressed Debt Strategies and determined that Plaintiffs owed substantial back-taxes, interest, and penalties.

**B.     THE 2002 DISTRESSED DEBT STRATEGY**

### 1.     About Distressed Debt

33.     The term "distressed debt" as used herein in the context of tax strategies typically refers to debt instruments that can be purchased at a significant discount from the face value of such debt instruments.  Thus, these debt instruments have a significant "built-in" loss.  This discount on the debt instruments can be attributable to a number of factors, including the prevailing economic conditions of the country in which the borrowers reside, the credit worthiness of the borrowers, and the lack of suitable collection efforts.

### 2.     The Distressed Debt Strategy

34.     The Distressed Debt Strategy was presented to Mr. Khan as a tax-advantaged investment designed to provide tax and non-tax benefits through investments in a distressed debt fund.  The tax component involves the contribution of distressed debts (generally assets trading substantially below their face value) from a foreign contributor to a U.S. partnership.  That partnership subsequently contributes the distressed debts to lower-tier partnerships.  The foreign partner then sells its interest in the lower-tier partnership to a U.S. taxpayer who contributes other assets to the partnership.  The tax benefit is realized when the partnership sells or exchanges the contributed distressed assets for cash or other assests.

### 3. Defendants "Pitch" the 2002 Distressed Debt Strategy to Plaintiffs[10]

35. Beginning in approximately 1993, BDO performed audit services for Chromecraft, a company owned in part by Plaintiff Shahid Khan. Mike Collins was the BDO partner in charge of the audit services for Chromecraft. By 1999, Collins had been one of Khan's trusted accountants and advisors for approximately six years.

36. In 1999, Khan was involved in negotiations to purchase a Canadian company that manufactured plastic automobile bumpers. Japanese investors owned the company, and these Japanese investors requested to be paid with Japanese Yen in connection with the sale of the company.

37. Khan needed to acquire a substantial amount of Japanese Yen in order to purchase the company, but he had no experience whatsoever in dealing in foreign currency trading. Accordingly, Khan requested that his partner in Chromecraft ask Collins if he could recommend any potential advisors with foreign currency trading experience.

38. In the Summer of 1999, Collins (who no doubt recognized Khan as potential "target" for BDO's Tax Solutions Group) referred Plaintiffs to Paul Shanbrom (a tax partner at BDO and member of BDO's Tax Solutions Group). Shanbrom introduced Khan to a tax-advantaged investment strategy involving the purchase and sale of digital options on foreign currency. BDO subsequently implemented tax-advantaged

---

[10] With respect to the 2002 Distressed Debt Strategy, the term "Plaintiffs" means Shahid R. Khan, Ann C. Khan, PBANAN LLC, CFURDR LLC, and UVIADO LLC.

**PLAINTIFFS' COMPLAINT AT LAW**                                                    **Page 19**

investment strategies involving digital options on foreign currency for Plaintiffs for the 1999, 2000 and 2001 tax years.[11]

39.    In the Spring of 2002, Shanbrom advised Khan that BDO had developed a new investment strategy that was completely different than the tax-advantaged investment strategies involving the purchase and sale of digital options on foreign currency.    Shanbrom then introduced a tax-advantaged investment strategy using investments in distressed debt (the "2002 Distressed Debt Strategy") to Khan.

40.    Shanbrom advised Khan that the 2002 Distressed Debt Strategy would provide Plaintiffs with an above-average return on their investment and, at the same time, legally minimize Plaintiffs' taxes.   Shanbrom stressed to Khan that the 2002 Distressed Debt Strategy was completely legal.   Shanbrom advised Khan that the 2002 Distressed Debt Strategy was a highly-confidential propriety investment strategy designed by BDO.   Shanbrom discussed the steps of the 2002 Distressed Debt Strategy with Khan and recommended that Khan execute the 2002 Distressed Debt Strategy.   Shanbrom told Khan that Gramercy had a limited amount of distressed debt and that the 2002 Distressed Debt Strategy could not be replicated.

41.    Shanbrom explained that Gramercy was the "expert" in foreign distressed debt investments and that Gramercy had a track record of making higher-than-average returns on their distressed debt investments.  Shanbrom also told Khan that Gramercy and BDO had experience working together on the Distressed Debt Strategy for other BDO

---

[11] Plaintiffs have filed a separate lawsuit against BDO, Gramercy and others with respect to the tax-reducing investment strategies that Plaintiffs entered into for the 1999, 2000 and 2001 tax years.

clients.  Shanbrom "touted" Gramercy's reputation and expertise with foreign distressed debt investments.

42.     Shanbrom recommended that Khan engage De Castro to issue the legal opinion for the 2002 Distressed Debt Strategy.  In fact, Shanbrom told Khan that De Castro was the only law firm that had the special qualifications and expertise to issue a legal opinion for the 2002 Distressed Debt Strategy.  Khan subsequently visited De Castro's offices in California.  Menasche Nass, the attorney at De Castro who authored the opinion letters, met with Khan and further explained the 2002 Distressed Debt Strategy and why it was a legal tax-advantaged investment strategy.  Nass assured Khan that the 2002 Distressed Debt Strategy was completely legal.  Nass also met with Khan in Champaign, Illinois on two occasions to discuss the 2002 Distressed Debt Strategy and to promote DeCastro for additional work for Khan.

43.     Khan also had discussions with Jay Johnston of Gramercy regarding the 2002 Distressed Debt Strategy.  Johnston discussed Gramercy's expertise with distressed debt investments and Gramercy's long history of achieving high rates of return on the distressed debt investments.  Johnston told Khan that Gramercy could achieve results for him that few, if any, other investment firms could get for Khan because of Gramercy's expertise in this area of investments.  Johnston advised Khan that BDO and Gramercy had a history of working with one another on the Distressed Debt Strategy for other BDO clients and that the 2002 Distressed Debt was a completely legal way to make a higher-than-average investment return and at the same time achieve substantial tax benefits.

44.     Khan eventually visited Gramercy's offices in Connecticut.  Khan met with Johnston and several other principals at Gramercy during these visits.

45.     BDO, Gramercy, DeCastro and Financial Strategy (collectively the "2002 Strategy Defendants") and the Other Participants, singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the purchase and sale of the 2002 Distressed Debt Strategy pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs.   Further, the 2002 Strategy Defendants and the Other Participants made various false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs.   The purpose and effect of the 2002 Strategy Defendants' and Other Participants' plan, transaction, and course of conduct was to generate fees by promoting an alleged tax-savings strategy.

46.     The 2002 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

47.     As a result of and in reliance on these misrepresentations and/or omissions, the Plaintiffs engaged in the 2002 Distressed Debt Strategy.   Had Plaintiffs known of the material adverse information that the 2002 Strategy Defendants did not disclose, they would not have entered into the 2002 Distressed Debt Strategy.

48.     The 2002 Strategy Defendants intended to deceive the Plaintiffs.   The combination of the relatively short time the Plaintiffs were given to consider the transaction, the manner in which the transaction was marketed, and the transaction's

failure to achieve its intended purpose lead to the conclusion that there is no possible explanation for the 2002 Strategy Defendants' behavior other than intentional deceit.

49. The fee to each of the 2002 Strategy Defendants and the Other Participants in the 2002 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction. The bigger the deal, the larger the fee shared by the 2002 Strategy Defendants and Other Participants.

### 4. The Features of the 2002 Distressed Debt Strategy

50. The features of the 2002 Distressed Debt Strategy, as outlined by the 2002 Strategy Defendants and their co-conspirators – the Other Participants, were as follows:

    a.    First, entities organized and existing under the laws of a foreign country contribute high-basis, low-value assets (distressed debt) to a newly created LLC (taxed as a partnership);

    b.    Second, the newly created LLC contributes the distressed debt to another newly formed LLC;

    c.    Third, Plaintiffs purchase an interest in the LLC from the foreign entity/entities and contribute other assets to the LLC;

    d.    Fourth, the LLC sells the distressed debt at fair-market value and Plaintiffs claim a loss based on the difference between the face value of the distressed debt and amount received upon the sale of the distressed debt.

### 5. Plaintiffs Engage in the 2002 Distressed Debt Strategy

#### a. The "Distressed Debt" is Contributed to the LLC's

51. HSS Indústria e Comércio Ltda. and Zhara Calcados Ltda. are entities organized under the laws of Brazil. On February 11, 2002, these entities contributed

certain emerging market receivables ("Notes") to PBANAN LLC in exchange for membership interests in PBANAN.

52.     Comércio de Tecidos e Confeccões Helensi Ltda., Guy Baday Ltda., and Mile Confeccões Ltda. are also entities organized under the laws of Brazil. On February 11, 2002, these entities contributed emerging market receivables to JAKEND LLC in exchange for membership interests therein.

53.     Distribuidora de Alimentos Quality Cacapaba, SP and Luciano Puccetta Emidio are also entities organized and existing under the laws of Brazil. On February 11, 2002, these entities contributed emerging market receivables to CFURDR LLC in exchange for membership interests.

54.     PBANAN LLC, JAKEND LLC and CFURDR LLC are referred to in this section as the ("Contributor LLCs"). Gramercy Advisors, LLC served as the managing member of each of these Contributor LLC's.

### b.     The Contributor LLCs Contribute the Distressed Debt

55.     On September 16, 2002, Tall Ships Capital Management, LLC (an affiliate of Gramercy), and each of the Contributor LLCs entered into an operating agreement for a recently formed Delaware limited liability company – UVIADO LLC. On September 16, 2002, the Contributor LLCs contributed the distressed debt to UVIADO LLC for membership interests therein.

### c.     Khan Purchases Option Positions

56.     On November 18, 2002, Khan purchased and sold options on the Japanese Yen. Khan executed these options with Refco Capital Markets, Ltd (the "FX Contracts"). Khan purchased a put option on the Japanese Yen with a notional amount of JPY

1,291,548,356,475 for a premium of $70,000,000.   The option strike price was 133.3280000 Yen/Dollar and the expiration date was September 26, 2003.   Khan also sold a put option on the Japanese Yen with a notional amount of JPY 1,291,548,356,475 for a premium of $69,500,000.   The option strike price was 133.3555350 Yen/Dollar and the expiration date was September 26, 2003.   Khan paid a total premium of $500,000 to Refco which represents the difference between the $70,000,000 paid for the option purchased and the $69,500,000 received for the option sold.

### d.   Khan Purchases an Interest in UVIADO LLC and Contribute the Option Positions

57.   On November 18, 2002, Khan purchased interests in UVIADO LLC from each of the Contributor LLCs.   Khan also contributed the option positions, cash, and other assets to UVIADO LLC.

### e.   The Distressed Debt is Exchanged

58.   On December 26, 2002, UVIADO LLC exchanged the distressed debt with an unrelated third party.

### 6.   The DeCastro Opinion Letter for the 2002 Distressed Debt Strategy

59.   In August 2003, Shanbrom contacted Khan to tell him that the De Castro legal opinion letter was ready.   Shanbrom told Khan that he had reviewed the legal opinion letter and made certain revisions to it. Shanbrom instructed Khan to send a check to DeCastro in order to receive the legal opinion letter.   On August 29, 2003, DeCastro issued a legal opinion letter to Khan regarding the propriety of the 2002 Distressed Debt Strategy.   The Plaintiffs were still under the mistaken belief that the opinion letter set forth "independent" opinions of an "independent" law firm on the propriety of the 2002 Distressed Debt Strategy.

60. The opinion letter was authored and prepared based, in part, on representations made by the 2002 Strategy Defendants. The opinion letter advised the Plaintiffs that, among other things, it was more likely than not that:

A. PBANAN LLC, JAKEND LLC, and CFURDR LLC and UVIADO LLC will be classified as a partnership, and each member in each PBANAN LLC, JAKEND LLC, and CFURDR LLC and UVIADO LLC will be treated as a partner of the partnership.

B. UVIADO LLC's tax basis in the Notes contributed to it by PBANAN LLC, JAKEND LLC, and CFURDR LLC is equal to such Contributor LLC's tax basis in the Notes immediately before their contribution to UVIADO LLC, increased by any gain recognized by such PBANAN LLC, JAKEND LLC, and/or CFURDR LLC on the contribution.

C. Plaintiff Shahid R. Khan's tax basis in the Spread Option is equal to the premium paid to acquire the Purchased Option.

D. Plaintiff does not recognize gain or loss on the contribution of the Spread Option to UVIADO LLC.

E. Plaintiff's initial tax basis in Plaintiff's membership interest in UVIADO LLC is equal to the aggregate amount paid by Investor to PBANAN LLC, JAKEND LLC, and CFURDR LLC to acquire an interest in UVIADO LLC, increased by the amount of cash and the tax basis of other assets contributed by Plaintiff to UVIADO LLC, reduced by the amount of liabilities, if any, assumed by UVIADO LLC (but without diminution for the contribution of the Sold Option to UVIADO LLC), and increased by gain, if any, recognized on the contribution of the Spread Option.

F. UVIADO LLC recognized a loss on the disposition of the Notes equal to the difference between UVIADO LLC's tax basis in the Notes immediately prior to the disposition and the proceeds of the disposition of the Notes.

G. Under Section 724 of the Code, 100% of the loss recognized by UVIADO LLC on the disposition of the Notes is ordinary. Alternatively, under Section 988: (i) 62.80% of the loss recognized by UVIADO LLC on disposition of the Notes is ordinary and 37.20% of such loss is capital.

H. Under Section 704(c), (i) 89.85% of the loss recognized by UVIADO LLC on its disposition of the HSS Notes and the Zhara Notes is

properly allocable to Plaintiffs as transferee and holder of a portion of PBANAN LLC's interest in UVIADO LLC for the year in which the disposition occurred, (ii) 80.35% of the loss recognized by UVIADO LLC on its disposition of the Helensia Notes, Baday Notes and Mile Notes is properly allocable to Plaintiff as transferee and holder of a portion of JAKEND LLC's interest in UVIADO LLC for the year in which the disposition occurred and (iii) 89.85% of the loss recognized by UVIADO LLC on its disposition of the Distribuidora Notes and Luciano Notes is properly allocable to Plaintiff as transferee and holder of a portion of CFURDR LLC's interest in UVIADO LLC for the year in which the disposition occurred.

I.     With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Plaintiff in connection with the Investment Transaction:

1.     The step transaction doctrine will not apply to the Investment Transactions;

2.     The requisite profit motive exists to support Plaintiff's deduction of any loss from the Investment Transactions under Section 165(c)(2);

3.     The sham transaction doctrine will not apply and the Investment Transactions will have the requisite business purpose and economic substance;

4.     The IRS will be unsuccessful if it asserts that UVIADO LLC should be disregarded;

5.     The IRS will be unsuccessful if it asserts under Treasury Regulations Section 1.701-2 that the Investment Transactions are inconsistent with the intent of Subchapter K;

6.     Any loss that Plaintiff incurs from the Investment Transactions will not be subject to the limitations under Section 469;

7.     Any loss that Plaintiff incurs from the Investment Transactions will not be limited by the Section 465 "at risk" rules;

8.     Section 482 will not be applicable to the Investment Transactions; and

9.     Section 1092 will not apply to limit losses incurred by Plaintiff from the investment in UVIADO LLC.

10.     IRS Notices and Field Service Advice will not apply to disallow Plaintiff's losses from the Investment Transactions.

J.      Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Investment Transactions as described herein will be upheld if challenged by the IRS.

K.      Plaintiff *will not* be subject to accuracy-related penalties as a result of reporting the income tax consequences of the Investment Transactions in a manner consistent with this opinion.

61.     Based on information and belief, in accordance with their pre-planned scheme, the 2002 Strategy Defendants were aware of the existence and effect of the applicable portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS authorities that indicated that the IRS would conclude that the 2002 Distressed Debt Strategy was not a legal tax-advantaged investment strategy, but intentionally failed to fully analyze and discuss the effect of these authorities on the 2002 Distressed Debt Strategy with Plaintiffs.

62.     The 2002 Strategy Defendants advised the Plaintiffs that as a result of the 2002 Distressed Debt Strategy, the Plaintiffs could properly and legally claim losses on their tax returns for 2002.

63.     Relying on the 2002 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2002 Distressed Debt Strategy on their federal and state tax returns for 2002.

### 7.      The BDO Opinion Letter for the 2002 Distressed Debt Strategy

64.     On October 9, 2003, BDO issued an opinion letter to Plaintiffs regarding the propriety of the 2002 Distressed Debt Strategy (the "2003 BDO opinion letter").

65.     BDO authored and prepared the opinion letter based, in part, on representations made by the 2002 Strategy Defendants. Not surprisingly, the 2003 BDO

opinion letter reached the same conclusions as the 2003 DeCastro opinion letter and

advised the Plaintiffs that, among other things, it was more likely than not that:

1.   UVIADO LLC will be classified as a partnership and the Plaintiff, PBANAN LLC, JAKEND LLC, and CFURDR LLC, and Tall Ships Capital Management LLC will be treated as partners of UVIADO LLC.  PBANAN LLC, JAKEND LLC, and CFURDR LLC will be classified as partnerships and the Foreigners and the Manager will be treated as partners of the respective Contributors of which they were members.

2.   The Plaintiff's tax basis in the Purchased Option transferred to UVIADO LLC will equal the premium paid with respect thereto and any other costs associated with acquiring such Option. The Plaintiff's tax basis in the UMS Option transferred to UVIADO LLC will equal the premium paid with respect thereto and any other costs associated with acquiring such UMS Option.

3.   The Sold Option will not constitute a "liability" under Code § 752.

4.   With respect to determining the Plaintiff's basis in UVIADO following his capital contribution:

   a.   The Purchased and Sold Options will not be integrated into a single instrument.

   b.   The Options will not be subject to the "mark-to-market" rules of Code § 1256.

   c.   The investment partnership rules of Code §§ 351 and 721 will not apply to require the Plaintiff to recognize any precontribution gain in the Options and other property contributed by the Plaintiff to UVIADO LLC.

   d.   Plaintiff will not be treated under the assignment of income doctrine as the taxable recipient of premium on the Sold Option.

   e.   Plaintiff will not be treated as UVIADO LLC's agent in acquiring the Options.

   f.   Code § 358(h) and Treas. Reg. § 1.752-6T will not apply with respect to the contribution of the Options by the Plaintiff to UVIADO LLC.

5.      UVIADO LLC has a tax basis in the Options equal to that same tax basis in the hands of Plaintiff immediately prior to their contribution to UVIADO LLC.

6.      UVIADO LLC has a tax basis in the Notes equal to that same tax basis in the hands of the Foreigners immediately prior to their contribution to PBANAN LLC, JAKEND LLC, and CFURDR LLC.

7.      Plaintiff will initially have a tax basis in its membership interest in UVIADO LLC equal to (i) the amount of money, (ii) the adjusted basis of other property contributed to UVIADO LLC, (iii) the amount of gain, if any, recognized by Plaintiff on the contribution under Code § 721(b) and (iv) its purchase price for its interest.

8.      PBANAN LLC, JAKEND LLC, and CFURDR LLC will initially have tax bases in their UVIADO LLC membership interests equal to there tax bases in the Notes they contributed to UVIADO LLC, increased by (i) the amount of money, (ii) the adjusted basis of other property contributed to UVIADO LLC, and (iii) the amount of gain, if any, recognized by each PBANAN LLC, JAKEND LLC, and CFURDR LLC on the contribution under Code § 721(b).

9.      UVIADO LLC will recognize a loss on the disposition of the Notes it sold on December 26, 2002 equal to the difference between its tax basis in those Notes and the amount of cash received from the disposition of such Notes.  Such loss will be ordinary in character.

10.     Under Code § 704(c), 85.63% of the loss described in item 9, above, will be allocated by UVIADO LLC to Plaintiff as an acquirer and holder of a portion of the PBANAN LLC, JAKEND LLC, and CFURDR LLC's Interests for the year in which the disposition occurs.

11.     Plaintiff will have sufficient tax basis in its membership interest in UVIADO LLC in order to pass through and deduct its allocation of the losses described in Item 9 above.  Code § 704(d) will not limit those deductions.

12.     With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Plaintiff in connection with the Transactions:

        a.      The sham transaction doctrine will not apply and, based on the representations provided to us, the Transactions will have the requisite business purpose and economic substance;

b.      Based on the representations furnished to us, the requisite profit motive exists to support the deduction of any loss from the Transactions under Code § 165(c)(2);

c.      PBANAN LLC, JAKEND LLC, and CFURDR LLC's ownership of their interests in UVIADO LLC will be respected, notwithstanding the brief periods of ownership of parts of the interests;

d.      The step transaction doctrine will not apply to the Transactions;

e.      The Service will be unsuccessful were it either to assert (i) under Reg. § 1.701-2 that the Transactions are inconsistent with the intent of subchapter K or (ii) that UVIADO LLC should be disregarded entirely under Reg. § 1.701-2 or under common law principles;

f.      Any loss that Plaintiff incurs from the Transactions will not be limited by the Code § 465 "at risk" rules;

g.      Any loss that Plaintiff incurs from the Transactions will not be subject to the limitations under Code § 469;

h.      Code § 482 will not be applicable to the Transactions; and

i.      Code § 446 will not apply to require an allocation of loss inconsistent with Code § 704(c).

13.    There is a greater than fifty percent (50%) likelihood that the tax treatment of the Transactions will be upheld if challenged by the Service.

14.    Plaintiff *should not* be subject to a penalty under Code § 6662(e)(1)(A), governing gross valuation misstatements, for positions taken on Plaintiff's U.S. Federal income tax return with respect to the Transactions.

15.    Plaintiff *should not* be subject, under Code § 6662(b)(2) or (3), to accuracy-related penalties for positions taken on the Investor's U.S. Federal income tax return with respect to the Transactions.

66.    Pursuant to their pre-planned scheme, the 2002 Strategy Defendants were aware of the existence and effect of the applicable portions of the Internal Revenue Code, established case law, common law doctrines, IRS notices, regulations, and IRS

authorities that indicated that the IRS would conclude that the 2002 Distressed Debt Strategy was not a legal tax-advantaged investment strategy, but intentionally failed to fully and properly analyze and/or discuss the effect of these authorities on the 2002 Distressed Debt Strategy with Plaintiffs.

67.     The 2002 Strategy Defendants advised the Plaintiffs that as a result of the 2002 Distressed Debt Strategy, the Plaintiffs could properly and legally claim losses on their tax returns for 2002.

68.     Relying on the 2002 Strategy Defendants' representations, Plaintiffs included the losses generated by the 2002 Distressed Debt Strategy on their federal and state tax returns for 2002.

### 8.     Plaintiffs File Tax Returns Based on the 2002 Strategy Defendants' Advice and Instructions

69.     Financial Strategy prepared and signed the 2002 federal tax return for UVIADO, LLC and provided Plaintiffs with a copy of this tax return. Financial Strategy, who had an undisclosed fee arrangement with Gramercy and/or BDO, was aware that and in fact intended on Plaintiffs using and relying on this tax return to prepare Plaintiffs' individual tax returns. BDO prepared and signed the 2002 individual federal tax return for the Plaintiffs on approximately October 10, 2003. This tax return contained the losses purportedly generated by the 2002 Distressed Debt Strategy.   The 2002 Strategy Defendants advised the Plaintiffs that their tax returns were properly prepared in accordance with professional standards.   In addition, the 2002 Strategy Defendants advised Plaintiffs that they could legally use the losses generated from the 2002 Distressed Debt Strategy on their tax returns. Based on these assurances, the DeCastro and BDO opinion letters, the 2002 Strategy Defendants' representations and instructions

during all phases of the promotion, sale, and implementation of the 2002 Distressed Debt Strategy, and the 2002 federal tax return for UVIADO, LLC, the Plaintiffs signed and filed their federal and state tax returns for the 2002 tax year. The filing of these tax returns was the final step of the 2002 Distressed Debt Strategy.

### 9.     Defendants Fail to Give Plaintiffs Full Disclosure

70.     At no time prior to or subsequent to Plaintiffs' implementation of the 2002 Distressed Debt Strategy did the 2002 Strategy Defendants inform the Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2002 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2002 Distressed Debt Strategy to the Plaintiffs. At this time, the 2002 Strategy Defendants knew or should have known that the IRS would conclude that the 2002 Distressed Debt Strategy was an illegal and abusive tax shelter and violated, among other things, the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities. The 2002 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

71.     Between the time the 2002 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2002 Distressed Debt Strategy and the time the Plaintiffs' tax returns were prepared, signed and filed, the 2002 Strategy Defendants never fully and properly disclosed to Plaintiffs the significance and existence of the published case law, common law doctrines, applicable portions of the Internal Revenue

**PLAINTIFFS' COMPLAINT AT LAW**                                                                  **Page 33**

Code, IRS notices, regulations and other applicable authorities that clearly indicated that the IRS would conclude that the 2002 Distressed Debt Strategy was an illegal and abusive tax shelter. The 2002 Strategy Defendants failed to advise Plaintiffs that the IRS would conclude that the 2002 Distressed Debt Strategy lacked the required business purpose and economic substance and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment. The 2002 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

72.     The 2002 Strategy Defendants failed to retract, modify, or qualify in any way their advice and opinions expressed to the Plaintiffs confirming the propriety of the 2002 Distressed Debt Strategy.

### 10.     The Cost of the 2002 Distressed Debt Strategy

73.     The Plaintiffs lost a significant amount of money in carrying out the 2002 Distressed Debt Strategy. For the 2002 Distressed Debt Strategy and tax returns in connection therewith, the Plaintiffs paid significant fees to the 2002 Strategy Defendants and the Other Participants.

74.     Further, in 2008, the IRS disallowed Plaintiffs' 2002 Distressed Debt Strategy and determined that Plaintiffs owed substantial back-taxes, interest, and penalties as a direct result of their participation in the 2002 Distressed Debt Strategy.

## C.     THE 2003 DISTRESSED DEBT STRATEGY

### 1.     Defendants "Pitch" the 2003 Distressed Debt Strategy to Plaintiffs[12]

75.     In the Spring of 2003, Shanbrom met with Khan and informed him that BDO had improved the Distressed Debt Strategy. According to Shanbrom, BDO and

---

[12] With respect to the 2003 Distressed Debt Strategy, the term "Plaintiffs" means Shahid R. Khan, Ann C. Khan, ANGLAISE LLC and JONCTION LLC.

Gramercy had re-designed the 2003 Distressed Debt Strategy to give clients like Khan a much greater chance of making even more money on the distressed debt investments. In addition, Shanbrom advised Khan that the 2003 Distressed Debt Strategy had the same tax benefits found in the 2002 Distressed Debt Strategy. Shanbrom told Khan that DeCastro had analyzed the 2003 Distressed Debt Strategy, concluded the 2003 Distressed Debt Strategy was legal, and agreed to issue another legal opinion for Khan if Khan executed the 2003 Distressed Debt Strategy.

76.     BDO, Gramercy, DeCastro and Financial Strategy (collectively the "2003 Strategy Defendants") singly and in concert, directly or indirectly, engaged in a common plan, transaction and course of conduct described herein in connection with the design, promotion, sale, and implementation of the 2003 Distressed Debt Strategy pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiffs. Further, the 2003 Strategy Defendants made various false statements of material fact and omitted to state material facts that made the statements misleading to Plaintiffs. The purpose and effect of the 2003 Strategy Defendants' plan, transaction, and course of conduct was to generate fees by promoting an alleged tax-advantaged investment strategy.

77.     The 2003 Strategy Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and/or disclose the true facts, even though such facts were available to them.

78.     As a result of and in reliance on these misrepresentations and omissions, the Plaintiffs engaged in the 2003 Distressed Debt Strategy. Had Plaintiffs known of the

material adverse information that the 2003 Strategy Defendants did not disclose, they would not have entered into the 2003 Distressed Debt Strategy.

79.     The 2003 Strategy Defendants intended to deceive the Plaintiffs.   The combination of the relatively short time the Plaintiffs were given to consider the transaction, the manner in which the transaction was marketed, and the transaction's failure to achieve its intended purpose lead to the conclusion that there is no possible explanation for the 2003 Strategy Defendants' behavior other than intentional deceit.

80.     Just as with the 2002 Distressed Debt Strategy, the fee to each of the 2003 Strategy Defendants in the 2003 Distressed Debt Strategy was not based on an hourly rate or time spent working on the deal; rather, the fee was based solely on "the size" of the transaction.   The bigger the deal, the larger the fee shared by the 2003 Strategy Defendants.

## 2.    The Features of the 2003 Distressed Debt Strategy

81.     The features of the 2003 Distressed Debt Strategy, as designed, marketed, sold and implemented by the 2003 Strategy Defendants, were as follows:

> a.     First, entities organized and existing under the laws of a foreign country contribute high-basis, low-value assets (distressed debt) to a newly created LLC (taxed as a partnership);
>
> b.     Second, the newly created LLC contributes the distressed debt to another newly formed LLC;
>
> c.     Third, Plaintiffs purchase an interest in the LLC from the foreign entity/entities and contribute other assets to the LLC;
>
> d.     Fourth, the LLC sells the distressed debt at fair-market value and the taxpayer claims a loss based on the difference between the face value of the distressed debt and amount received upon the sale of the distressed debt.

**PLAINTIFFS' COMPLAINT AT LAW**                                        **Page 36**

### 3.   Plaintiffs Engage in the 2003 Distressed Debt Strategy

#### a.   The "Distressed Debt" is Contributed to the LLC

82.   JC Comércio Ind. Representação de Materiais de Construção Ltda. is an entity organized and existing under the laws of Brazil.  On March 25, 2003, this entity contributed certain emerging market receivables ("Notes") to ANGLAISE LLC in exchange for a membership interest in ANGLAISE.

83.   Blocon Ind. Comércio de Materiais de Construção Ltda. is also an entity organized and existing under the laws of Brazil.  On March 25, 2003, this entity contributed emerging market receivables to ANGLAISE LLC in exchange for a membership interest therein.

84.   Metalúrgica Xavante Ltda. is also an entity organized and existing under the laws of Brazil.  On March 25, 2003, this entity contributed emerging market receivables to ANGLAISE LLC in exchange for membership interests.

85.   Gramercy Asset Management, LLC served as the managing member of ANGLAISE LLC.

#### b.   ANGLAISE LLC Contributes the Distressed Debt to JONCTION LLC

86.   On April 15, 2003, Gramercy Asset Management, LLC and ANGLAISE entered into an Operating Agreement for a recently formed Delaware limited liability company – JONCTION LLC.  On April 15, 2003, ANGLAISE LLC contributed the distressed debt to JONCTION LLC for a membership interest therein.

### c.   Plaintiffs Purchase an Interest in UVIADO LLC

87.   On May 21, 2003, Plaintiffs purchased an interest in JONCTION LLC from AINGLAISE LLC.

### d.   JONCTION LLC Contributes Distressed Debt to LEMAN LLC

88.   On May 21, 2003, ANGLAISE LLC contributed the distressed debt to LEMAN LLC in exchange for an interest in LEMAN LLC. ANGLAISE LLC and Gramercy Asset Management, LLC contributed additional capital to ANGLAISE LLC.

### e.   LEMAN LLC Exchanges the Distressed Debt

89.   On December 26, 2003, LEMAN LLC exchanged the distressed debt for other distressed debt held by Gramercy Financial Services.

### 3.   The DeCastro Opinion Letter for the 2003 Distressed Debt Strategy

90.   In August 2003, Shanbrom contacted Khan to tell him that the De Castro legal opinion letter was ready. Shanbrom told Khan that he had reviewed the legal opinion letter and made certain revisions to it. Shanbrom instructed Khan to send a check to DeCastro in order to receive the legal opinion letter. On January 15, 2004, DeCastro issued a legal opinion letter to Plaintiffs regarding the propriety of the 2003 Distressed Debt Strategy (the "2004 DeCastro opinion letter"). The Plaintiffs were still under the mistaken belief that the legal opinion letter set forth "independent" opinions of an "independent" law firm on the propriety of the 2003 Distressed Debt Strategy.

91.   The legal opinion letter was authored and prepared based, in part, on representations made by the 2003 Strategy Defendants. The opinion letter advised the Plaintiffs that, among other things, it was more likely than not that:

A.      ANGLAISE LLC, JONCTION LLC, and LEMAN LLC will each be classified as a partnership, and each member of these LLCs will be treated as a partner of the partnership.

B.      JONCTION LLC's tax basis in the Notes was equal to ANGLAISE LLC's tax basis in the Notes immediately before its contribution to JONCTION LLC, increased by any gain recognized by ANGLAISE LLC on the contribution.

C.      Plaintiff's initial tax basis in Plaintiff's membership interest in JONCTION LLC is equal to the aggregate amount paid by Plaintiff to ANGLAISE LLC to acquire its interest in JONCTION LLC, increased by the amount of cash and the tax basis of other assets contributed by Plaintiff to JONCTION LLC, reduced by the amount of liabilities, if any, assumed by JONCTION LLC and increased by gain, if any, recognized on the contribution of the assets.

D.      JONCTION LLC's initial tax basis in its membership interest in LEMAN LLC is equal to the amount of cash and the tax basis of the Notes contributed by JONCTION LLC to LEMAN LLC, and LEMAN LLC's tax basis in the Notes is equal to JONCTION LLC's tax basis in the Notes immediately before their contribution to LEMAN LLC.

E.      LEMAN LLC recognized a loss on the disposition of the Notes equal to the difference between LEMAN LLC's tax basis in the Notes immediately prior to the disposition and the proceeds of the sale of the Notes.

F.      Under Section 724 of the Code, 100% of the loss realized by LEMAN LLC on its disposition of the Notes is ordinary. Alternatively, under Section 988, 65.5% of the loss recognized by LEMAN LLC on the disposition of the Notes is ordinary and 34.5% of the loss recognized by LEMAN LLC on the disposition of the Notes is capital.

G.      Under Section 704(c), (i) 100% of the loss recognized by LEMAN LLC on its disposition of the Notes is properly allocable to JONCTION LLC and (ii) 90% of the loss so allocated to JONCTION LLC is properly allocable to Plaintiff as transferee and holder of a portion of ANGLAISE LLC's interest in JONCTION LLC for the year in which the disposition occurred.

H.      With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by Plaintiff in connection with the Transactions:

1.      The step transaction doctrine will not apply to the Transactions;

2.      The requisite profit motive exists to support Plaintiff's deduction of any loss from the Transactions under Section 165(c)(2);

3.      The sham transaction doctrine will not apply and the Transactions will have the requisite business purpose and economic substance;

4.      The IRS will be unsuccessful if it asserts that the ANGLAISE LLC, JONCTION LLC and/or LEMAN LLC should be disregarded;

5.      The IRS will be unsuccessful if it asserts under Treasury Regulations Section 1.701-2 that the Transactions are inconsistent with the intent of Subchapter K;

6.      Any loss that Plaintiff incurs from the Transactions will not be subject to the limitations under Section 469;

7.      Any loss that Plaintiff incurs from the Transactions will not be limited by the Section 465 "at risk" rules; and

8.      Section 482 will not be applicable to the Transactions;

I.      Based upon the foregoing, there is a greater than 50 percent likelihood that the tax treatment of the Transactions as described herein will be upheld if challenged by the IRS.

J.      Plaintiff *will not* be subject to accuracy-related penalties as a result of reporting the income tax consequences of the Transactions in a manner consistent with this opinion.

92.     The 2004 DeCastro legal opinion letter intentionally failed to fully and properly analyze and discuss the effect of the applicable portions of the tax code, published case law, common law doctrines, IRS notices, regulations and other applicable authorities impacting the validity and legality of the 2003 Distressed Debt Strategy.

93.     The 2003 Strategy Defendants advised the Plaintiffs that as a result of the 2003 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2003.

94.     Relying on the 2003 Strategy Defendants' representations and instructions, the Plaintiffs included the losses generated by the 2003 Distressed Debt Strategy on their federal and state tax returns for 2003.

### 5.     The BDO Opinion Letter for the 2003 Distressed Debt Strategy

95.     On February 6, 2004, BDO issued an opinion letter to Plaintiffs regarding the propriety of the 2003 Distressed Debt Strategy (the "2004 BDO opinion letter").

96.     The 2004 BDO opinion letter was authored and prepared based, in part, on representations made by the 2003 Strategy Defendants. Not surprisingly, the 2004 BDO opinion letter reached the same conclusions as the 2004 DeCastro opinion letter and advised the Plaintiffs that, among other things, it was more likely than not that:

1.     JONCTION LLC will be classified as a partnership and Plaintiff, ANGLAISE LLC, and Gramercy Asset Management LLC will be treated as partners of JONCTION LLC. ANGLAISE LLC will be classified as a partnership and the Contributors of the Notes and the Gramercy Asset Management LLC will be treated as partners of ANGLAISE LLC.

2.     LEMAN LLC has a tax basis in the Notes equal to that same tax basis in the hands of each of the Contributors of the Notes immediately prior to those Notes' contribution to ANGLAISE LLC.

3.     Plaintiff will initially have a tax basis in its membership interest in JONCTION LLC equal to (i) the amount of money, (ii) the adjusted basis of the other property contributed to JONCTION LLC, (iii) the amount of gain, if any, recognized by Plaintiff on the contribution under Code § 721(b) and (iv) its purchase price for its interest.

4.     LEMAN LLC will be classified as a partnership and JONCTION LLC would be treated as a partner of LEMAN LLC.

5.      ANGLAISE LLC will initially have a tax basis in its JONCTION LLC membership interest equal to its tax basis in the Notes contributed to JONCTION LLC, increased by (i) the amount of money, (ii) the adjusted basis of other property contributed to JONCTION LLC, and (iii) the amount of gain, if any, recognized by ANGLAISE LLC on the contribution under Code § 721 (b).  JONCTION LLC will initially have a tax basis in its LEMAN LLC membership interest equal to its tax basis in the Notes contributed to LEMAN LLC, increased by (i) the amount of money, (ii) the adjusted basis of other property contributed to LEMAN LLC, and (iii) the amount of gain, if any, recognized by JONCTION LLC on the contribution under Code § 721 (b).

6.      LEMAN LLC will recognize a loss on the disposition of the Notes equal to the difference between its tax basis in those Notes and the amount of cash received from the disposition of such Notes.  Such loss will be ordinary in character.

7.      Under Code § 704(c), the loss described in item 6, above, will be allocated by LEMAN LLC to JONCTION LLC, and ninety percent (90%) of that loss will then be allocated by JONCTION LLC to the Plaintiff as an acquirer and holder of a portion of ANGLAISE LLC's Interest for the year in which the disposition occurs.

8.      JONCTION LLC will have sufficient tax basis in its membership interest in LEMAN LLC to pass through and deduct its allocation of losses described in item 6, above, and Plaintiff will have sufficient tax basis in its membership interest in JONCTION LLC in order to pass through and deduct its allocation of those losses.  Code § 704(d) would not limit those deductions.

9.      With respect to the application of certain loss limitation rules potentially affecting the deductibility of any loss claimed by the Plaintiff in connection with the Transactions:

a.      The sham transaction doctrine will not apply and, based on the representations provided to us, the Transactions will have the requisite business purpose and economic substance;

b.      Based on the representations furnished to us, the requisite profit motive exists to support the deduction of any loss from the Transaction under Code § 165(c)(2);

c.      ANGLAISE LLC's ownership of its interest in JONCTION LLC will be respected, notwithstanding the brief period of ownership of part of the interest;

d.      The step transaction doctrine will not apply to the Transactions;

e.      The Service will be unsuccessful were it either to assert (i) under Reg. § 1.701-2 that the Transactions are inconsistent with the intent of subchapter K or (ii) that JONCTION LLC should be disregarded entirely under Reg. § 1.701-2 or under common law principles;

f.      Any loss Plaintiff incurs from the Transactions will not be limited by the Code § 465 "at risk" rules;

g.      Any loss that Plaintiff incurs from the Transactions will not be subject to the limitations under Code § 469;

h.      Code § 482 will not be applicable to the Transactions; and

i.      Code § 446 would not apply to require an allocation of loss inconsistent with Code § 704(c).

10.    There is a greater than fifty percent (50%) likelihood that the tax treatment of the Transactions will be upheld if challenged by the Service.

11.    Plaintiff *should not* be subject to a penalty under Code § 6662(e)(1)(A), governing gross valuation misstatements, for positions taken on the Plaintiffs' U.S. Federal income tax return with respect to the Transactions.

12.    Plaintiff *should not* be subject, under Code § 6662(b)(2) or (3), to accuracy-related penalties for positions taken on the Plaintiffs' U.S. Federal income tax return with respect to Transactions.

97.    The 2004 BDO opinion letter failed to properly analyze and discuss the applicable portions of the tax code, published case law, common law doctrines, IRS notices, regulations and other applicable authorities that clearly indicated that the IRS would conclude that the 2003 Distressed Debt Strategy was an illegal and abusive tax shelter. The 2003 Strategy Defendants were aware of the existence and effect of the tax code, case law, common law doctrines, IRS notices, regulations and other applicable

authorities regarding the validity of the 2003 Distressed Debt Strategy, but intentionally failed to fully analyze and discuss their effect on the 2003 Distressed Debt Strategy.

98.     The 2003 Strategy Defendants advised the Plaintiffs that as a result of the 2003 Distressed Debt Strategy, the Plaintiffs could properly claim losses on their tax returns for 2003.

99.     Relying on the 2003 Strategy Defendants' representations and instructions, the Plaintiffs included the losses generated by the 2003 Distressed Debt Strategy on their federal and state tax returns in 2003.

### 6.     Plaintiffs File Tax Returns Based on the 2003 Strategy Defendants' Advice and Instructions

100.    Financial Strategy prepared the 2003 federal tax return for LEMAN LLC and provided Plaintiffs with a copy of this tax return. Financial Strategy, who had an undisclosed fee arrangement with Gramercy and/or BDO, was aware that and in fact intended on Plaintiffs using and relying on this tax return to prepare Plaintiffs' individual tax returns. BDO prepared the 2003 individual federal tax return for the Plaintiffs. BDO signed Plaintiffs' 2003 individual federal tax return on October 11, 2004. BDO also prepared the 2003 federal tax return for JONCTION LLC. BDO signed the 2003 federal tax return for JONCTION LLC on September 30, 2004. These tax returns contained the losses purportedly generated by the 2003 Distressed Debt Strategy. The 2003 Strategy Defendants advised the Plaintiffs that the tax returns were properly prepared in accordance with professional standards. The 2003 Strategy Defendants advised Plaintiffs that the losses generated from the 2003 Distressed Debt Strategy could be legally used on Plaintiffs' tax returns. Based on these assurances, the 2004 DeCastro and 2004 BDO opinion letters, the 2003 Strategy Defendants' representations during all phases of the

promotion, sale, and implementation of the 2003 Distressed Debt Strategy, and the tax returns for JONCTION LLC and LEMAN LLC, the Plaintiffs signed and filed their federal tax returns for the year 2003. Plaintiffs' filing of these tax returns using the 2003 Distressed Debt Strategy was the final step of the 2003 Distressed Debt Strategy.

## 7.    The 2003 Strategy Defendants Fail to Give Plaintiffs Full Disclosure

101.    At no time prior to or subsequent to Plaintiffs' implementation of the 2003 Distressed Debt Strategy did the 2003 Strategy Defendants inform Plaintiffs that the IRS contended that such transactions constituted tax shelters within the meaning of Code § 6111 or otherwise, and that the 2003 Strategy Defendants were therefore illegally promoting an unregistered tax shelter by marketing the 2003 Distressed Debt Strategy to the Plaintiffs. At this time, the 2003 Strategy Defendants knew or should have known that the IRS would conclude that the 2003 Distressed Debt Strategy was an illegal and abusive tax shelter and violated the partnership anti-abuse rules under Treas. Reg. § 1.701-2(b), the step transaction doctrine, the sham transaction doctrine, the economic substance doctrine, and the business purpose doctrine, as well as numerous other established authorities. The 2003 Strategy Defendants failed to inform the Plaintiffs of these facts and, in fact, advised them to the contrary to Plaintiffs' detriment.

102.    Between the time the 2003 Strategy Defendants advised, recommended, and instructed the Plaintiffs to enter into the 2003 Distressed Debt Strategy and the time the Plaintiffs' respective tax returns were prepared, signed and filed, the 2003 Strategy Defendants never disclosed to Plaintiffs that the IRS would conclude that the 2003 Distressed Debt Strategy lacked the required business purpose and economic substance

and, in fact, advised Plaintiffs to the contrary to Plaintiffs' detriment. The 2003 Strategy Defendants intentionally failed to disclose this material information to the Plaintiffs.

103.    The 2003 Strategy Defendants knew or should have known, before they induced Plaintiffs to enter into the 2003 Distressed Debt Strategy, before they assisted Plaintiffs in the implementation of the 2003 Distressed Debt Strategy, before DeCastro and BDO issued the opinion letters, and before Plaintiffs filed their tax returns in reliance on the 2003 Strategy Defendants' representations, instructions, and assurances, that the IRS would conclude that the purported losses arising from the 2003 Distressed Debt Strategy were not properly allowable for federal or state income tax purposes. However, the 2003 Strategy Defendants intentionally failed to inform Plaintiffs of this and, indeed, informed them to the contrary to Plaintiffs' detriment.

104.    The 2003 Strategy Defendants failed to retract, modify, or qualify in any way their advice, instructions, and opinions expressed to the Plaintiffs confirming the propriety of the 2003 Distressed Debt Strategy.

## 8.    The Cost of the 2003 Distressed Debt Strategy

105.    The Plaintiffs lost a significant amount of money in carrying out the 2003 Distressed Debt Strategy. For the 2003 Distressed Debt Strategy and tax returns in connection therewith, the Plaintiffs paid significant fees to the 2003 Strategy Defendants and the Other Participants.

106.    Further, in 2008, the IRS disallowed the Plaintiffs' 2003 Distressed Debt Strategy and determined that Plaintiffs owed substantial back-taxes, interest, and penalties as a direct result of their participation in the 2003 Distressed Debt Strategy.

## D.   CONSPIRACY AMONG THE DEFENDANTS

107.    Each of the Defendants and the Other Participants involved in the Distressed Debt Strategies executed by Plaintiffs conspired with one another to design, promote, sell, and implement the Distressed Debt Strategies for the purpose of receiving and splitting substantial fees (the "Defendants' Arrangement").  The receipt of those fees was the primary, if not sole, motive in the development and execution of the Distressed Debt Strategies.  Further, the amount of fees earned by the Defendants and the Other Participants was not tied to or reflective of the amount of time and effort they expended in providing tax, investment, legal or accounting services, but rather was tied to the amount of capital and/or ordinary losses each client, including Plaintiffs, would claim on their tax returns.   Indeed, the Defendants and the Other Participants designed the Distressed Debt Strategies and agreed to provide a veneer of legitimacy to each other's opinion as to the lawfulness and tax consequences of the Distressed Debt Strategies by agreeing to the representations that would be made and to issue the allegedly "independent" opinions before potential clients, including Plaintiffs, were solicited.

108.    The Defendants and the Other Participants aggressively put their scheme into action.  The Defendants and the Other Participants solicited their own clients to enter into the Distressed Debt Strategies.  The Defendants identified the Plaintiffs (and other successful individuals) as potential clients based on their knowledge of their finances. The clients became "targets".  And in the end, the Plaintiffs, like so many other clients, became a "victim" of corporate greed.

109.    The receipt of fees and pecuniary gain from those fees was the primary motive for the Defendants' and the Other Participants' conduct;  the provision of

professional services to clients was merely an incidental byproduct of, not a motivating factor for, the Defendants' conduct alleged herein. Further, the Defendants' Arrangement gave each of the participating Defendants and the Other Participants a significant pecuniary interest in the advice and professional services they would render.

110. The Defendants and the Other Participants had a financial, business and property interest in inducing the Plaintiffs, as well as other clients, to enter into the Distressed Debt Strategies, and to do so, promised, opined and assured that the Distressed Debt Strategies would provide the Plaintiffs with a reasonable opportunity to make a profit on the "investments" and at the same time legally reduce Plaintiffs' taxes.

111. The Defendants and the Other Participants entered into the Defendants' Arrangement, whereby they agreed they would solicit each other's clients and split the fees to be charged clients that executed the Distressed Debt Strategies, including the Plaintiffs.

112. Here, the Defendants and the Other Participants conspired to perpetrate a fraud on Plaintiffs.[13] Each of the Defendants and the Other Participants had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the Distressed Debt Strategies. In addition, the Defendants and the Other Participants authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Defendants and the Other Participants.

---

[13] As previously noted, Michael Kerekes, Adrian Dicker and Charles Bee, high-level partners at BDO and members of BDO's Tax Solutions Group – the organization within BDO responsible for the design, marketing, sale and implementation of BDO's tax-reducing strategies – have admitted in their respective plea convictions that BDO was involved a conspiracy to perpetrate a fraud in connection with the design, marketing, sale, and implementation of BDO tax shelters. See Kerekes Plea Agreement at p. 2; See United States Department of Justice Release: "Former Accounting Firm Vice Chairman / Board Member Pleads Guilty to Tax Fraud Related to Tax Shelters."

**E.     THE IRS AUDITS PLAINTIFFS' TAX RETURNS AS A RESULT OF THE DISTRESSED DEBT STRATEGIES**

113.    Plaintiffs received Notices of Audit (Notice of Beginning of Administrative Proceeding) for their 2002 and 2003 tax returns in 2005 and 2006, respectively.  In 2008, Plaintiffs received certain Notices of Adjustment from the IRS indicating that the IRS intended to disallow the Distressed Debt Strategies.  Also in 2008, Plaintiffs received Notices of Deficiency with respect to the IRS's disallowance of the Distressed Debt Strategies.  As a result of Defendants' conduct set forth above, the IRS determined in 2008 that Plaintiffs owed substantial back-taxes, penalties and interest as a direct result of the Distressed Debt Strategies.

**IV.**

## DISCOVERY RULE DEFERRED ACCRUAL OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

114.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

115.    The causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule deferred accrual of the respective statutes of limitation for such causes of action.

**V.**

## ACCRUAL OF STATUTE OF REPOSE AS TO PLAINTIFFS' ACCOUNTING MALPRACTICE CLAIM

116.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

117.    Plaintiffs' cause of action for negligence/professional malpractice asserted against BDO Seidman herein is timely filed as the respective statute of repose for such cause of action did not begin to accrue until recently at the earliest because BDO continued to commit negligence/professional malpractice and make numerous misrepresentations and omissions of material fact in connection with the Distressed Debt Strategies during this time period.

118.    Further, BDO and Financial Strategy prepared certain of the tax returns for Plaintiffs utilizing the losses purportedly generated by the Distressed Debt Strategies. Thus, the exception to the statute of repose set forth in 735 ILCS 5/13-214.2 is applicable to BDO and Financial Strategy.

## VI.

## TOLLING OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS DUE TO FRAUDULENT CONCEALMENT

119.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

120.    The causes of action asserted by Plaintiffs against Defendants are timely filed as Defendants fraudulently concealed the wrongful conduct alleged herein.

121.    Defendants had actual knowledge of the wrongful conduct alleged herein.

122.    Defendants fraudulently concealed the wrongful acts and omissions alleged herein by remaining silent and making misrepresentations about wrongful conduct despite having a duty to inform Plaintiffs of such wrongful acts and omissions. Defendants' silence and misrepresentations prevented Plaintiffs from discovering Defendants' wrongful acts and omissions.

123.    Defendants had a fixed purpose to conceal the wrongful conduct.

124.    Plaintiffs reasonably relied on Defendants' silence and misrepresentations to the detriment of Plaintiffs.

## VII.

## CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTY

125.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

126.    The Defendants, as the Plaintiffs' attorneys, accountants, and tax, financial and investment advisors were Plaintiffs' fiduciaries.  Plaintiffs placed their trust and confidence in Defendants, and Defendants had influence and superiority over the Plaintiffs.  Thus, Defendants owed Plaintiffs the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.

127.    Defendants breached their fiduciary duties to Plaintiffs by, among other ways:

(a)        advising Plaintiffs to engage in the Distressed Debt Strategies;

(b)        failing to advise Plaintiffs that the legal opinions were not "independent" and as a result could not provide the required legal support or penalty protection;

(c)        advising Plaintiffs that they could make a profit on the FX Contracts and the investments in distressed debt;

(d)        orchestrating the implementation of the Distressed Debt Strategies;

(e)        providing the purported required legal opinion letters verifying the soundness of the Distressed Debt Strategies;

(f)                failing to advise Plaintiffs that certain Defendants had undisclosed fee splitting or sharing arrangements; and

(g)                advising Plaintiffs to sign and file the tax returns in reliance on Defendants' advice, representations, recommendations, instructions, and opinions, which, according to the IRS, Defendants knew or should have known the IRS would conclude were improper and illegal, for the purpose of generating huge fees for Defendants.

128.     As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

129.     As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

### COUNT II – NEGLIGENCE/PROFESSIONAL MALPRACTICE

130.     Plaintiffs repeat and reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

131.     As Plaintiffs' attorneys, accountants, and tax, financial and investment advisors, Defendants owed Plaintiffs a duty to comply with the applicable standards of care.

132.    Defendants failed to meet those applicable standards of care. Defendants' failure to meet the standard of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

133.    Defendants' failure to meet the applicable standard of care constitutes negligence.

134.    In addition, Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs seek punitive/exemplary damages against Defendants.

135.    The Defendants' negligence/gross negligence was a proximate cause of Plaintiffs' damages.    In reasonable reliance on Defendants' advice regarding the Distressed Debt Strategies, Plaintiffs participated in the Distressed Debt Strategies and paid significant fees to the Defendants and the Other Participants for investment, tax and legal advice in connection with the implementation of the Distressed Debt Strategies, filed federal and state tax returns that reflected losses generated from the Distressed Debt Strategies, and did not take advantage of other legitimate tax savings opportunities.

136.    But for Defendants' negligence/gross negligence, Plaintiffs would not have hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, would not have engaged in the Distressed Debt Strategies, would not have filed federal and state tax returns that utilized losses generated from the Distressed Debt Strategies, and would not have failed to avail themselves of other legitimate tax savings opportunities.

137.    Defendants' negligence/gross negligence proximately caused damages to Plaintiffs in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt

**PLAINTIFFS' COMPLAINT AT LAW**                                              **Page 53**

and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

138.    As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT III – NEGLIGENT MISREPRESENTATION

139.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

140.    During the course of their representation of Plaintiffs, Defendants made numerous negligently affirmative representations that were improper and false and negligently misleading omissions of material fact to Plaintiffs.

141.    Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong. Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs was improper and wrong and would mislead Plaintiffs.

142.    The Defendants' negligent misrepresentations were a proximate cause of Plaintiffs' damages.  In reasonable reliance on Defendants' negligent misrepresentations regarding the Distressed Debt Strategies, Plaintiffs participated in the Distressed Debt Strategies and paid significant fees to the Defendants and the Other Participants for investment, tax and legal advice in connection with the implementation of the Distressed Debt Strategies, filed federal and state tax returns that reflected losses generated from the

Distressed Debt Strategies, and did not take advantage of other legitimate tax savings opportunities.

143.    But for Defendants' negligent misrepresentations and material omissions described above, Plaintiffs would not have (a) hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, (b) engaged in the Distressed Debt Strategies, (c) filed federal and state tax returns that utilized losses generated from the Distressed Debt Strategies, and (d) failed to avail themselves of other legitimate tax savings opportunities.

144.    The Defendants' conduct set forth herein proximately caused Plaintiffs to suffer injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

145.    As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT IV - DISGORGEMENT

146.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

147.   As a result of Defendants' breach of their fiduciary duty, they should be required to disgorge all payments received by them from Plaintiffs or from any entity for work performed in connection with the Distressed Debt Strategies.

148.   Additionally, regardless of the merits of the tax, legal, financial and investment advice and services Defendants rendered to Plaintiffs, the fees the Defendants charged and which Plaintiffs paid are unethically excessive and in violation the applicable rules of professional conduct.

149.   Further, since Defendants did not disclose information that they were required to disclose - *i.e.,* the Defendants' pre-planned scheme: the fact that Defendants conspired to design, market, sell, and implement the Distressed Debt Strategies; the opinion letters were not independent and could not provide the required legal support for the propriety of the Distressed Debt Strategies and could not provide penalty protection; the Defendants had a significant pecuniary interest in the Distressed Debt Strategies; and the Defendants' representation of Plaintiffs and their arrangement with the Defendants and the Other Participants violated the applicable rules of professional conduct - their fee agreements with Plaintiffs are not enforceable.

150.   Accordingly, the Defendants must disgorge their fees to Plaintiffs.   In addition, Plaintiffs seek an award of attorneys' fees, interest, and costs.

## COUNT V – RESCISSION

151.   Plaintiffs reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

152.   Plaintiffs and Defendants entered into investment management agreements, engagement agreements, consulting agreements, and other agreements in

connection with the Distressed Debt Strategies ("Engagement Agreements"). In deciding to enter into the Engagement Agreements, Plaintiffs relied on numerous material knowingly false affirmative representations and intentional omissions of material fact Defendants made to Plaintiffs. Had Defendants not made those misrepresentations or omissions, Plaintiffs would not have entered into the Engagement Agreements. Defendants made those misrepresentations and omissions with the intent that Plaintiffs would rely on them. Plaintiffs are not in breach of any of their obligations pursuant to the Engagement Agreements.

153.     Further, as set forth above, the Engagement Agreements that Plaintiffs entered into with Defendants were procured by fraud, and Defendants fraudulently induced Plaintiffs to enter into these Engagement Agreements in furtherance of the conspiracy between and among the Defendants and the Other Participants. For instance, with respect to BDO, according to the Criminal Information against Michael Kerekes, the BDO Engagement Agreements were deliberately broad and vague as to the services BDO rendered and the fees paid by Plaintiffs in connection with the Distressed Debt Strategies.

154.     Plaintiffs seek rescission of the Engagement Agreements. In addition, Plaintiffs seek an award of attorneys' fees, interest, and costs.

## COUNT VI – DECLARATORY JUDGMENT

155.     Plaintiffs reallege and incorporate each and every prior factual allegation set forth in the preceding paragraphs as if fully set forth herein.

156.     An actual, justiciable controversy exists between Plaintiffs on the one hand and the Defendants on the other with regard to the Engagement Agreements and the FX Contracts.

157.    Plaintiffs seek a declaration that the Engagement Agreements entered into with Defendants are unenforceable due to a lack of consideration, or in the alternative, a failure of consideration, in that the Defendants knew or should have known that the transactions they proposed would not yield the benefits to Plaintiffs that were promised by the Defendants.  As a result, all promises of the Defendants under those contracts are merely "illusory" and, without those promises, the Engagement Agreements fail due to a lack of consideration.

158.    Further, as set forth above, the Engagement Agreements that Plaintiffs entered into with Defendants were procured by fraud, and Defendants fraudulently induced Plaintiffs to enter into these consulting agreements in furtherance of the conspiracy between and among the Defendants and the Other Participants. For instance, with respect to BDO, according to the Criminal Information against Michael Kerekes, these Engagement Agreements were deliberately broad and vague as to BDO services and the fees paid by Plaintiffs in connection with the Distressed Debt Strategies.

159.    The FX Contracts that Plaintiffs entered into with Refco are unenforceable due to a lack of consideration, or in the alternative, a failure of consideration, in that Refco retained virtually unlimited discretion to determine whether the FX Contracts would pay out and therefore, could ensure, if they so chose, that the FX Contracts would *not* pay out or limit the amount of any payout. As a result, all promises of Refco under those contracts are merely "illusory" and, without those promises, the FX Contracts fail due to a lack of consideration.

160.    Had the Defendants not enticed Plaintiffs to enter into the Engagement Agreements and FX Contracts, they would not have paid fees to the Defendants and the

**PLAINTIFFS' COMPLAINT AT LAW**                                                    **Page 58**

Other Participants either.   Thus, Plaintiffs seek a declaration that, due to the foregoing lack of consideration, the Defendants have been unjustly enriched and all fees paid to Defendants and the Other Participants should be returned to Plaintiffs.

**COUNT VII – FRAUD**

161.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

162.   In order to induce the Plaintiffs to pay them substantial fees, the Defendants – directly and indirectly through the Other Participants - made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs, including but not limited to:

(1)   Advising and recommending that Plaintiffs engage in illegal and abusive tax shelters, the Distressed Debt Strategies;

(2)   Charging and collecting unreasonable, excessive, and unethical fees;

(3)   Failing to disclose the actual roles and relationships of Defendants and the Other Participants (e.g., the conspiracy) in the Distressed Debt Strategies;

(4)   Failing to disclose that the Defendants and Other Participants were splitting and/or sharing fees;

(5)   Representing to Plaintiffs that the tax savings of the Distressed Debt Strategies to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(6)   Representing to Plaintiffs that the tax benefits of the Distressed Debt Strategies far outweighed any potential loss that might be incurred on the FX Contracts and the investments in distressed debt;

(7)    Advising Plaintiffs that the De Castro opinion letters were "independent" legal opinions from "independent" law firms;

(8)    Failing to advise Plaintiffs that the De Castro opinion letters were not "independent" legal opinions from "independent" law firms;

(9)    Advising Plaintiffs that the De Castro opinion letters could be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(10)   Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(11)   Advising Plaintiffs that the De Castro opinion letters could be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(12)   Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(13)   Advising Plaintiffs that the Distressed Debt Strategies would more likely than not be upheld as legal tax advantaged investment strategies if audited;

(14)   Failing to advise Plaintiffs that the IRS would more likely than not conclude the Distressed Debt Strategies are illegal and abusive tax shelters if Plaintiffs are audited;

(15)   Advising Plaintiffs that there was a reasonable likelihood of making a profit on the "investment" component of the Distressed Debt Strategies;

(16)    Designing, marketing, selling, and implementing illegal and abusive tax shelters that are disallowed and prohibited by the IRS;

(17)    Failing to advise Plaintiffs that DeCastro had already prepared "form" opinion letters approving the respective Distressed Debt Strategies and needed to only fill in several blanks for each of the many clients to which they rendered such opinion letters;

(18)    Illegally promoting unregistered tax shelters by marketing the Distressed Debt Strategies to Plaintiffs;

(19)    Failing to disclose to Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could and/or would likely be liable for penalties and interest;

(20)    Advising Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could not and would not be liable for penalties and/or interest;

(21)    Advising Plaintiffs that the bases created by the Distressed Debt Strategies were legitimate, proper, and in accordance with all applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(22)    Recommending, advising, instructing, and/or assisting Plaintiffs in implementing and carrying out all phases of the illegal and abusive tax shelters, the Distressed Debt Strategies;

(23)    Advising Plaintiffs that the Distressed Debt Strategies had the required business purpose and economic substance;

**PLAINTIFFS' COMPLAINT AT LAW**                                    **Page 61**

(24)   Making and endorsing the statements and representations in the opinion letters authored and signed by De Castro;

(25)   Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral advice, instructions, and recommendations;

(26)   Advising Plaintiffs that each of the Defendants and the Other Participants were "independent" of one another when in fact these Defendants and Other Participants were involved in a conspiracy to market, sell, and implement the Distressed Debt Strategies;

(27)   Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Distressed Debt Strategies;

(28)   Advising, instructing, and assisting Plaintiffs in the purchase and execution of the FX Contracts and the investments in distressed debt;

(29)   Advising Plaintiffs that they had an opportunity of making a profit on the investments in distressed debt when, in fact, it was virtually impossible to make a profit taking into account the fees and costs of the Distressed Debt Strategies;

(30)   Advising, instructing, and assisting in the preparation of Plaintiffs' tax returns, which utilized the losses generated by an illegal and abusive tax shelters, the Distressed Debt Strategies;

(31)   Signing Plaintiffs' tax returns and advising Plaintiffs to sign and file the tax returns;

(32)   Failing to advise Plaintiffs not to use the losses generated from the

Distressed Debt Strategies on the Plaintiffs' tax returns;

(33)   Advising, confirming, and/or ratifying that the De Castro opinion letters were accurate and correct;

(34)   Advising Plaintiffs that their tax returns, which utilized the reduction in taxes generated by the Distressed Debt Strategies, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(35)   Failing to disclose existing published authority that indicated that the purported tax consequences for transactions such as the Distressed Debt Strategies were improper and not allowable for Federal income tax purposes;

(36)   Failing to advise Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(37)   Advising Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(38)   Knowingly engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(39)   Advising the Plaintiffs that the step transaction, sham transaction, business purpose and economic substance doctrines and the partnership anti-abuse

regulations would not apply to disallow the results of the Distressed Debt Strategies;

(40)   Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply to the Distressed Debt Strategies;

(41)   Failing to advise Plaintiffs that Treasury Regulation Section 1.701-2 would apply the Distressed Debt Strategies;

(42)   Advising, instructing, and assisting Plaintiffs in entering into transactions in which Defendants advised Plaintiffs that the step transaction, sham transaction, business purpose and/or economic substance doctrines and the partnership anti-abuse regulations did not apply to disallow the results of the Distressed Debt Strategies;

(43)   Advising Plaintiffs that each of the various steps of the Distressed Debt Strategies were meaningful and imbued with the requisite non-tax considerations;

(44)   Informing the Plaintiffs that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed by the IRS for tax purposes;

(45)   Informing the Plaintiffs that the De Castro opinion letters would confirm that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed by the IRS for tax purposes;

(46)   Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts and the investments in distressed debt as an investment and/or part of a tax strategy;

(47) Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, were, according to the IRS, illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked the required economic substance and business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines and the partnership anti-abuse regulations;

(48) Advising Plaintiffs that the purchase and sale of the distressed debt investments were actual, bona-fide investments and/or the purchase and sale of these investments were arms-length transactions;

(49) Advising Plaintiffs to execute the Defendants' respective Engagement Agreements and agree to the arbitration provision therein, attempting to intentionally and knowingly limit or eliminate Plaintiffs' ability to recover from Defendants, when Defendants knew that the Distressed Debt Strategies were likely to be disallowed as illegal and abusive tax shelters and Plaintiffs would sustain substantial damages due to Defendants' conspiracy to perpetrate a fraud; and

(50) Advising Plaintiffs that they would prevail in litigation with the IRS over the merits of the Distressed Debt Strategies.

163. The above intentional omissions of material fact and/or affirmative misrepresentations made by each Defendant were false when made and the Defendants knew these representations to be false when made with the intention that Plaintiffs rely upon them in entering into the Distressed Debt Strategies and pay them substantial fees.

In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were made knowingly by the Defendants with the intent to induce Plaintiffs to enter into the Distressed Debt Strategies and pay Defendants and the Other Participants substantial fees.

164.    In reasonable reliance on the Defendants' false affirmative representations and intentional omissions of material facts regarding the Distressed Debt Strategies, Plaintiffs paid substantial fees to Defendants and the Other Participants, paid additional amounts to execute the Distressed Debt Strategies, unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, filed federal and state tax returns that reflected improper tax treatment resulting from the Distressed Debt Strategies, did not disclose the transaction on their federal and state tax returns as a tax shelter, and did not avail themselves of other legitimate tax savings opportunities.

165.    But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs would never have hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, engaged in the Distressed Debt Strategies, utilized an improper tax bases on their income tax returns, filed and signed their tax returns as prepared in reliance on the Defendants' advice and/or not disclose the Distressed Debt Strategies on their tax returns as tax shelters. After discovering the Defendants' fraud, Plaintiffs incurred and will continue to incur substantial additional costs to rectify the situation.

166.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2)

they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

167.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fee, interest, and costs.

### COUNT VIII – VIOLATIONS OF ILLINOIS CONSUMER FRAUD ACT

168.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

169.   In order to induce the Plaintiffs to pay them substantial fees, the Defendants used and employed deception, fraud, false promises, misrepresentations and concealed, suppressed and omitted numerous material facts, including but not limited to:

(1)   Advising and recommending that Plaintiffs engage in illegal and abusive tax shelters, the Distressed Debt Strategies;

(2)   Charging and collecting unreasonable, excessive, and unethical fees;

(3)   Failing to disclose the actual roles and relationships of Defendants and the Other Participants (e.g., the conspiracy) in the Distressed Debt Strategies;

(4)   Failing to disclose that the Defendants and Other Participants were splitting and/or sharing fees;

(5)   Representing to Plaintiffs that the tax savings of the Distressed Debt Strategies to Plaintiffs would be significant and far outweigh the amount of fees and costs incurred by Plaintiffs;

(6)    Representing to Plaintiffs that the tax benefits of the Distressed Debt Strategies far outweighed any potential loss that might be incurred on the FX Contracts and the investments in distressed debt;

(7)    Advising Plaintiffs that the De Castro opinion letters were "independent" legal opinions from "independent" law firms;

(8)    Failing to advise Plaintiffs that the De Castro opinion letters were not "independent" legal opinions from "independent" law firms;

(9)    Advising Plaintiffs that the De Castro opinion letters could be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(10)    Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon by Plaintiffs to protect Plaintiffs from incurring penalties if audited;

(11)    Advising Plaintiffs that the De Castro opinion letters could be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(12)    Failing to advise Plaintiffs that the De Castro opinion letters could not be relied upon to satisfy the IRS as to the propriety of the Distressed Debt Strategies if audited;

(13)    Advising Plaintiffs that the Distressed Debt Strategies would more likely than not be upheld as legal tax advantaged investment strategies if audited;

(14)    Failing to advise Plaintiffs that the IRS would more likely than not conclude the Distressed Debt Strategies are illegal and abusive tax shelters if Plaintiffs are audited;

(15)  Advising Plaintiffs that there was a reasonable likelihood of making a profit on the "investment" component of the Distressed Debt Strategies;

(16)  Designing, marketing, selling, and implementing illegal and abusive tax shelters that are disallowed and prohibited by the IRS;

(17)  Failing to advise Plaintiffs that DeCastro had already prepared "form" opinion letters approving the respective Distressed Debt Strategies;

(18)  Illegally promoting unregistered tax shelters by marketing the Distressed Debt Strategies to Plaintiffs;

(19)  Failing to disclose to Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could and/or would likely be liable for penalties and interest;

(20)  Advising Plaintiffs that if they filed tax returns based on the Distressed Debt Strategies they could not and would not be liable for penalties and/or interest;

(21)  Advising Plaintiffs that the bases created by the Distressed Debt Strategies were legitimate, proper, and in accordance with all applicable tax laws, rules, regulations, common law doctrines, and court decisions;

(22)  Recommending, advising, instructing, and/or assisting Plaintiffs in implementing and carrying out all phases of the illegal and abusive tax shelters, the Distressed Debt Strategies;

(23)  Advising Plaintiffs that the Distressed Debt Strategies had the required business purpose and economic substance;

(24)    Making and endorsing the statements and representations in the opinion letters authored and signed by De Castro;

(25)    Making and endorsing the statements and representations contained in the Defendants' and the Other Participants' oral advice, instructions, and recommendations;

(26)    Advising Plaintiffs that each of the Defendants and the Other Participants were "independent" of one another when in fact these Defendants and Other Participants were involved in a conspiracy to market, sell, and implement the Distressed Debt Strategies;

(27)    Recommending, advising, instructing, and assisting Plaintiffs in carrying out each of the steps of the Distressed Debt Strategies;

(28)    Advising, instructing, and assisting Plaintiffs in the purchase and execution of the FX Contracts and the investments in distressed debt;

(29)    Advising Plaintiffs that they had an opportunity of making a profit on the investments in distressed debt;

(30)    Advising, instructing, and assisting in the preparation of Plaintiffs' tax returns, which utilized the losses generated by, according to the IRS, illegal and abusive tax shelters, the Distressed Debt Strategies;

(31)    Signing Plaintiffs' tax returns and advising Plaintiffs to sign and file the tax returns;

(32)    Failing to advise Plaintiffs not to use the losses generated from the Distressed Debt Strategies on the Plaintiffs' tax returns;

(33)    Advising, confirming, and/or ratifying that the De Castro opinion letters

were accurate and correct;

(34) Advising Plaintiffs that their tax returns, which utilized the reduction in taxes generated by the Distressed Debt Strategies, were prepared in accordance with professional standards and pursuant to IRS guidelines and established legal authorities;

(35) Failing to disclose existing published authority that, according the IRS, indicated that the purported tax consequences for transactions such as the Distressed Debt Strategies were improper and not allowable for Federal income tax purposes;

(36) Failing to advise Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute did not, according to the IRS, comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(37) Advising Plaintiffs that the Distressed Debt Strategies the Defendants and the Other Participants advised Plaintiffs to execute complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(38) Knowingly engaging in professional relationships that violated their respective professional and ethical rules of conduct;

(39) Advising the Plaintiffs that the step transaction, sham transaction, business purpose and economic substance doctrines and the partnership anti-abuse regulations would not apply to disallow the results of the Distressed Debt Strategies;

(40)     Advising the Plaintiffs that Treasury Regulation Section 1.701-2 would not apply to the Distressed Debt Strategies;

(41)     Failing to advise Plaintiffs that Treasury Regulation Section 1.701-2 would, according to the IRS, apply to the Distressed Debt Strategies;

(42)     Advising, instructing, and assisting Plaintiffs in entering into transactions in which Defendants advised Plaintiffs that the step transaction, sham transaction, business purpose and/or economic substance doctrines and the partnership anti-abuse regulations did not apply to disallow the results of the Distressed Debt Strategies;

(43)     Advising Plaintiffs that each of the various aspects of the Distressed Debt Strategies were meaningful and imbued with the requisite non-tax considerations;

(44)     Informing the Plaintiffs that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed by the IRS for tax purposes;

(45)     Informing the Plaintiffs that the De Castro opinion letters would confirm that the Distressed Debt Strategies were not "sham transactions" that would be ignored or disallowed for tax purposes;

(46)     Recommending, instructing, and advising Plaintiffs to enter into the FX Contracts and the investments in distressed debt as an investment and/or part of a tax strategy;

(47)     Advising, recommending, instructing, and assisting Plaintiffs in entering into transactions that, unbeknownst to the Plaintiffs, the IRS claimed were

illegal and improper and would be disallowed and held invalid by the IRS on the grounds the transactions lacked the required economic substance and business purpose, were "sham transactions", and violated the step transaction, sham transaction, and economic substance doctrines and the partnership anti-abuse regulations;

(48)  Advising Plaintiffs that the purchase and sale of the distressed debt investments were actual, bona-fide investments and/or the purchase and sale of these investments were arms-length transactions;

(49)  Advising Plaintiffs to execute the Defendants' respective Engagement Agreements and agree to the arbitration provision therein, attempting to intentionally and knowingly limit or eliminate Plaintiffs' ability to recover from Defendants, when Defendants knew that the Distressed Debt Strategies were likely to be disallowed as illegal and abusive tax shelters and Plaintiffs would sustain substantial damages due to Defendants' conspiracy to perpetrate a fraud; and

(50)  Advising Plaintiffs that they would prevail in litigation with the IRS over the merits of the Distressed Debt Strategies.

170.  The above deception, fraud, false promises, misrepresentations and concealment, suppression and omissions of numerous material facts were made by each Defendant and were false when made and the Defendants knew them to be false when made with the intention that Plaintiffs rely upon them in entering into the Distressed Debt Strategies and pay them substantial fees.  The deception, fraud, false promises, misrepresentations and concealment, suppression and omissions of material facts were

made in the conduct of trade and/or commerce as defined by the Illinois Consumer Fraud Act.

171.    In reasonable reliance on the Defendants' violations of the Illinois Consumer Fraud Act, Plaintiffs paid substantial fees to Defendants and the Other Participants, paid additional amounts to execute the Distressed Debt Strategies, unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, filed tax returns that reflected improper tax treatment resulting from the Distressed Debt Strategies, did not disclose the Distressed Debt Strategies on their tax returns as tax shelters, and failed to avail themselves of other legitimate tax savings opportunities.

172.    But for Defendants' violations of the Illinois Consumer Fraud Act described above, Plaintiffs would never have hired Defendants and the Other Participants for advice on the Distressed Debt Strategies, engaged in the Distressed Debt Strategies, utilized improper tax bases on their income tax returns, signed and filed their tax returns as prepared in reliance on the Defendants and the Other Participants' advice, failed to disclose the Distressed Debt Strategies on their tax returns as tax shelters, and failed to participate in other legitimate tax savings opportunities.

173.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

174. As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

## COUNT IX – BREACH OF CONTRACT

175. Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

176. In the alternative to Count V and VI, Plaintiffs entered into oral and/or written contracts with the Defendants to provide Plaintiffs with professionally competent legal, accounting, and tax advice and services, tax preparation services, and investment advice and services. In addition, Defendants represented to Plaintiffs that Plaintiffs purchased legal tax-advantaged investment strategies that the Plaintiffs could legally use on their tax returns, that the IRS would allow, and that Plaintiffs would never have to pay a penalty or interest to the IRS.

177. Plaintiffs fully performed their obligations to the Defendants under these contracts and thus did not contribute to these Defendants' breaches in any way.

178. These Defendants breached their obligations under the oral and/or written contracts with the Plaintiffs, which caused damages to the Plaintiffs. For instance, Defendants marketed and sold the illegal and abusive tax shelters to Plaintiffs. The Defendants then implemented these illegal and abusive tax shelters for Plaintiffs. The Distressed Debt Strategies were not legal tax-advantaged investments strategies as Defendants promised Plaintiffs they would receive and which Plaintiffs bargained for. Certain of Defendants assisted in the preparation of Plaintiffs' tax returns, signed

Plaintiffs' tax returns and advised the Plaintiffs to sign and file the tax returns using the losses generated by these illegal and abusive tax shelters.

179.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

180.    As a proximate result of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded all actual, consequential, and incidental damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

### COUNT X – CIVIL CONSPIRACY

181.    Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

182.    As described more fully above, the Defendants and the Other Participants knowingly acted in concert to design, market, sell, and implement tax strategies that the IRS has concluded are fraudulent, illegal and abusive tax shelters – the Distressed Debt Strategies. In furtherance of their conspiracy, the Defendants and the Other Participants conspired to perpetrate fraud on the Plaintiffs. In doing so, the Defendants and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions that had economic substance from an investment standpoint, when

the transaction in fact lacked those features (which were necessary for a successful tax strategy).

183.    The Defendants and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs (*i.e.*, the Defendants' Arrangement), all for the purposes of obtaining professional fees from consumers, including the Plaintiffs.  The Defendants and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant and/or Other Participant made to Plaintiffs.

184.    The acts of the Defendants and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs.

185.    There was a meeting of the minds between and among the Defendants and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on Plaintiffs.  The conspiracy to commit these unlawful and fraudulent acts proximately caused and continue to cause Plaintiffs' damages as previously set forth herein.

186.    As a result of Defendants' conduct set forth herein, Plaintiffs have suffered injury in that (1) they paid significant fees to the Defendants and Other Participants, (2) they unnecessarily purchased the FX Contracts and the investments in distressed debt and made other investments to effectuate the Distressed Debt Strategies, (3) the IRS has determined that Plaintiffs owe substantial back-taxes, penalties and interest, and (4) they lost the opportunity to avail themselves of other legitimate tax-savings strategies.

187.   Plaintiffs have been injured in an actual amount to be proven at trial and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## VIII.

## **PRAYER FOR RELIEF**

188.   Based upon the foregoing, Plaintiffs request that Defendants be cited to appear and answer, and that on final hearing Plaintiffs have judgment against Defendants, jointly and severally for:

a.   actual damages;

b.   pre- and post-judgment interest at the highest legal rate allowed by law;

c.   all attorneys' fees and costs in pursuing this matter;

d.   punitive, consequential, incidental, and treble damages in an amount to be determined at trial;

e.   such other and further relief, both at law and in equity, to which Plaintiffs may show themselves to be justly entitled.

Dated: July __6__, 2009.

Respectfully submitted,

_Richard R. Harden_

THOMAS, MAMER & HAUGHEY, LLP
PO Box 560
Champaign, IL 61820
PH: 217-351-1500
FAX: 217-351-2017
LOCAL COUNSEL FOR PLAINTIFFS

FOOTE, MEYERS, MIELKE &
FLOWERS, LLC
CRAIG S. MIELKE
416 South Second Street
Geneva, Illinois 60134
(630) 232-6333
(630) 845-8982 (fax)

LOEWINSOHN FLEGLE DEARY, LLP
DAVID R. DEARY
Texas Bar No. 05624900
CAROL E. FARQUHAR
Texas Bar No. 06828300
COREY WEINSTEIN
Texas Bar No. 24037685
J. DYLAN SNAPP
Texas Bar No. 24053484
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 - Telephone
(214) 572-1717 – Facsimile

ATTORNEYS FOR PLAINTIFFS